UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Heather Gillespie, Angela Cinson individually and on behalf of all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>Equifax Information Services, LLC<br><br>Defendant. | Case No.: 05-C-0138<br><br>Judge: Matthew F. Kennelly<br><br>Magistrate Judge: Martin C. Ashman<br><br>(Class Action)<br><br>A JURY TRIAL IS REQUESTED |

## APPENDIX OF EXHIBITS AND DECLARATION IN SUPPORT OF PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THE RENEWED MOTION FOR CLASS CERTIFICATION

**FILED**
**NF,**
FEB 0 3 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

James M. Pietz
IL Id. # 6197586
Malakoff Doyle & Finberg, P.C.
200 Frick Building
Pittsburgh, PA 15219
(412) 281-8400 - phone
(412) 281-3262 - fax
jpietz@mdfpc.com - e-mail

O. Randolph Bragg (Local Counsel)
IL Id # 6221983
Horwitz, Horwitz & Associates
25 E. Washington Street, Suite 900
Chicago, IL 60602
(312) 372-8822 - phone
312-372-1673 - fax
rand@horwitzlaw.com - e-mail

Attorneys for the Representative
Plaintiffs, Heather Gillespie, Angela
Cinson and the Class They Represent

## TABLE OF CONTENTS

| Exhibit | Description |
| --- | --- |
| 1 | Defendant Equifax Information Services LLC's Responses to Plaintiffs' Second Set of Interrogatories |
| 2 | Memorandum Opinion and Order in *Nance v. Lawrence Friedman*, 1999 WL 966444 (N.D. Ill, Oct. 19, 1999) |
| 3 | *Murray v. GMAC Mortgage Corp.*, 2006 WL 90081 (7th Cir. 2006) |
| 4 | Memorandum Opinion and Order in *Muniz v. Rexnord Corporation*, 2005 WL 1243428 (N.D. Ill., Feb. 10, 2005) |
| 5 | Sherman Financial Group, Alegis Group, L.P. - Agency Manual |
| 6 | *Reynolds v. Hartford Financial Services Group, Inc.*, 2006 WL 171920 (9th Cir., Jan. 25, 2006) |

## DECLARATION OF JAMES M. PIETZ

Pursuant to 28 U.S.C. § 1746, James M. Pietz hereby declares as follows:

1.      I am a member of the law firm of Malakoff, Doyle & Finberg, PC, and one of the attorneys for the Plaintiffs in this case. I am admitted to practice in the Commonwealth of Pennsylvania and the State of Illinois.

2.      Attached as Exhibit 5 is a true and correct copy of a document that was produced by the parties in the case of *Cardascio v. Sherman Acquisition LLC*, 3:01 cv 1937-RNC (D.C. Conn) that was obtained from the Plaintiffs counsel in that case. The *Cardascio* documents included the document identified as "Sherman Financial Group" Agency Manual attached as Exhibit 5.

This declaration is made under the penalty of perjury.

February 2, 2006

_____
James M. Pietz

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HEATHER GILLESPIE and ANGELA )
CINSON, individually and on behalf )
of all similarly situated individuals, )
　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs, )　　　Case No.　　　05-C-0138
　　　　　　　　　　　　　　　　　)
　　　　v. )　　　Judge Kennelly
　　　　　　　　　　　　　　　　　)　　　Magistrate Judge Ashman
EQUIFAX INFORMATION )
SERVICES LLC, )
　　　　　　　　　　　　　　　　　)
　　　　Defendant. )

## DEFENDANT EQUIFAX INFORMATION SERVICES LLC'S
## RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

NOW COMES Defendant Equifax Information Services LLC, by its attorneys, and

pursuant to Fed. R. Civ. P. 33, hereby responds to plaintiffs' Second Set of Interrogatories,

stating as follows:

### Interrogatory No. 25 (labeled as No. 1 in plaintiffs' Second Set):

State the number of natural persons residing in New Jersey and North Carolina whose file
at Equifax evidenced a delinquent or collection account in the name of any of the Sherman
Entities between December 27, 2002 and the present. Explain the procedures or programs used
to, or created to, make this determination.

### Response No. 25:

Equifax maintains a dynamic database that is continually being updated with new

information from data furnishers. The information in its database is always current, and

therefore cannot be used to determine what a particular file looked like on a particular date in

history. Thus, Equifax has no easily accessible way of determining whether a Sherman account

actually existed on a file in the past. Equifax is able to determine that as of today, there are

270,479 consumer files with Sherman accounts upon them. Equifax accessed this data by

running a query through its database to determine the unique number of files containing Sherman accounts.

**Interrogatory No. 26 (labeled as No. 2 in plaintiffs' Second Set):**

State the number of natural persons residing in New Jersey and North Carolina who had a trade-line evidencing a delinquent or collection account in the name of one or more of the Sherman Entities on their file at Equifax and who made a consumer file disclosure request between December 27, 2002 and the present. Explain the procedures or programs used to, or created to, make this determination.

**Response No. 26:**

Equifax objects to this Interrogatory as exceeding the limits of Fed. R. Civ. P. 33(a).

**Interrogatory No. 27 (labeled as No. 3 in plaintiffs' Second Set):**

Identify every policy, practice, requirement and procedure established by and between Sherman and Equifax and within Equifax to avoid violations of 15 U.S.C. § 1681c(a)(4) and all documents related to and all persons with knowledge of such policies, practices, requirements and procedures.

**Response No. 27:**

Equifax objects to this Interrogatory as exceeding the limits of Fed. R. Civ. P. 33(a).

**Interrogatory No. 28 (labeled as No. 4 in plaintiffs' Second Set):**

Identify all policies, practices and procedures required of Sherman by Equifax in furnishing information about consumers to Equifax, as well as all documents related to and all persons with knowledge of such policies, practices, requirements and procedures.

**Response No. 28:**

Equifax objects to this Interrogatory as exceeding the limits of Fed. R. Civ. P. 33(a).

**Interrogatory No. 29 (labeled as No. 5 in plaintiffs' Second Set):**

Identify all persons who participated in preparing or providing the answers to these interrogatories.

**Response No. 29:**

Equifax objects to this Interrogatory as exceeding the limits of Fed. R. Civ. P. 33(a).

This 7th day of November, 2005.

Respectfully submitted,

EQUIFAX INFORMATION
SERVICES LLC

By: _____

John J. Friedline (#90785819)
Kilpatrick Stockton LLP
1100 Peachtree St., Ste. 2800
Atlanta, Georgia 30309-4530
(404) 815-6500

David Hartsell, Esq.
Brian Marquez, Esq.
McGuireWoods
77 W. Wacker Dr., Ste. 4100
Chicago, Illinois 60601
(312) 558-1000

## VERIFICATION OF ALICIA FLUELLEN

Personally appeared before the undersigned officer, duly authorized by law to administer oaths, Alicia Fluellen, an employee and representative of the defendant Equifax Information Services LLC, who, after being duly sworn, deposes and states that the facts contained within the Defendant Responses to the foregoing Interrogatories are true and correct to the best of her knowledge, information, and belief.

This ___7___ day of November, 2005.

_____
Alicia Fluellen

Sworn to and subscribed before
me this ___1___ day of November, 2005.

_____
Notary Public    D. MARTIN NOTARYPUBLIC
COBB COUNTY, GA
MY COMMISSION
EXPIRES 10/19/08

# EXHIBIT 2

**Westlaw.**

Not Reported in F.Supp.2d
1999 WL 966444 (N.D.Ill.)
**(Cite as: 1999 WL 966444 (N.D.Ill.))**

Page 1

# H

### Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Lashone D. NANCE and Kristin Calkins, individually
and on behalf of all others
similarly situated, Plaintiffs,
v.
LAWRENCE FRIEDMAN P.C., Defendant.
**No. 98 C 6720.**

Oct. 19, 1999.

*MEMORANDUM OPINION AND ORDER*

KENNELLY, J.

*1 This case is before the Court on plaintiffs' motion
for class certification. Plaintiffs Lashone Nance and
Kristin Calkins received form collection letters from
Lawrence Friedman P.C., a law firm, which they claim
violate the Fair Debt Collection Practices Act
("FDCPA"), 15 U.S.C. § 1692 *et seq.* They contend that
the letters were deceptive in that they purported to be
from an attorney when in fact no attorney had reviewed
their matters in any meaningful sense. *See generally
Avila v. Rubin,* 84 F.3d 222 (7th Cir.1996). They also
contend that language in the letters about paying the
debt and the possibility of a lawsuit improperly
overshadowed the "validation notice" required by the
FDCPA for such letters, a notice telling the debtor that
he or she has 30 days to dispute validity of all or
portion of the debt.

Plaintiffs seek certification of a class consisting of all
Illinois residents who, within one year before the filing
of this action, were sent an initial collection letter by
defendant, similar to those attached to the complaint,

which sought to collect an alleged debt incurred for
personal, family, or household purposes, where the
letter was not returned as undelivered. To maintain a
class action, plaintiffs must satisfy all of the
requirements of Rule 23(a) and one of the requirements
of Rule 23(b). Rule 23(a) requires that (1) the class is
so numerous that joinder of all members is
impracticable; (2) there are questions of law or fact
common to the class; (3) the claims or defenses of the
representatives are typical of those of the class; and (4)
the representatives will fairly and adequately protect the
interests of the class. Fed.R.Civ.P. 23(a). If these
prerequisites are satisfied, the court must determine
whether one of the standards of Rule 23(b) is met.
Plaintiffs argue that questions of law or fact common to
the class predominate over individual issues and that a
class action is superior to other available methods for
the fair and efficient adjudication of this controversy.
*See* Fed.R.Civ.P. 23(b)(3).

Defendants do not contest that plaintiffs satisfy the
numerosity and commonality requirements of Rule
23(a) and the predominance requirement of Rule
23(b)(3). The Court finds that these requirements have
been met, along with Rule 23(b)(3)'s requirement that
a class action be a superior method of adjudicating the
controversy. Plaintiffs do not claim to know the exact
number of class members but argue that the numerosity
requirement is satisfied based on the law firm's
consistent use of a form letter to collect debts;
defendant has not disputed this argument. Both the
claims of the named plaintiffs and those of the proposed
class arise from the same practice, namely the defendant
law firm's use of a form collection letter, and are based
on the same legal theories, thus satisfying the
commonality requirement. It is readily apparent that
determining the propriety of the law firm's use of the
form letter will predominate over any individual
questions. Because the issues in this case concern the
propriety of a form letter mailed to large numbers of
consumers, as well as the fact that the FDCPA
specifically contemplates class actions, *see* 15 U.S.C. §
1692k(a)(2)(B) & (b)(2), a class action is superior to
other available methods of resolving this controversy.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 966444 (N.D.Ill.)
(Cite as: 1999 WL 966444 (N.D.Ill.))

Page 2

*See generally Francisco v. Doctors and Merchants Credit Service, Inc.*, No. 98 C 716, 1998 WL 474107, at *2 (N.D.Ill. Aug. 3, 1998) (Conlon, J.); *Davis-Holden v. Merchants Legal Services*, No. 98 C 691, 1999 WL 703293 (N.D.Ill. Aug. 25, 1999) (Kennelly, J.).

\*2 Plaintiffs' claims are also typical of those of the class. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983) (quoting H. Newberg, Class Actions § 1115(b), at 185 (1977)). The claims of the class arise from the class members' receipt of form collection letters that were the same or similar as those sent to the named plaintiffs. The legal theory is also the same for the named plaintiffs as for each of the members of the three classes—simply put, that the defendant law firm's sending of the form letters violates the FDCPA. The Court therefore finds that the typicality requirement is met.

Defendant's primary objection to class certification is that plaintiffs Lashone Nance and Kristin Calkins will not adequately represent the class. Defendant argues that Calkins was not misled by the form letter because at the time she received it, she was already a plaintiff in a FDCPA case alleging a similar theory of liability, and because her husband, an attorney, explained it to her. While this may differentiate Calkins from other class members, defendant has made no effort to explain how these fact are material to the issues in this case. Liability under the FDCPA is determined by an objective test--that is, whether an "unsophisticated consumer" would have been misled-- and is not dependent upon actual reliance by the plaintiff. *Avila*, 84 F.3d at 227-29 (upholding liability under theory similar to that urged here without any indication of proof of actual deception); *see also, e.g., Sledge v. Sands*, 182 F.R.D. 255, 258 (N.D.Ill.1998) (Bucklo, J.) (citing *Gammon v. GC Services Limited Partnership*, 27 F.3d 1254, 1257 (7th Cir.1994)); *United States v. National Financial Services, Inc.*, 98 F.3d 131, 139 (4th Cir.1996) (test is whether the statement has the capacity to mislead; evidence of actual deception is

unnecessary). In short, the particulars of whether Calkins was or was not deceived by the letter do not make her claims atypical, nor do they render her an inadequate class representative.

Defendant also argues that Calkins is not an adequate class representative because a number of years ago, she was convicted of a misdemeanor for writing a bad check. Calkins has explained in an affidavit that in 1991, at age 18, she inadvertently wrote several checks on insufficient funds but moved around the same time and thus did not learn that this was the case until 1993, when she discovered that a warrant had been issued for her arrest. She pled guilty after being advised that if she paid the amount in question, $123.90, and did 40 hours of community service, her plea would be withdrawn and the case dismissed. She has submitted a court record which verifies that the ultimate disposition of the case was to be a dismissal. We do not consider this youthful impropriety as disqualifying Calkins from serving as a class representative here.

\*3 Defendant argues that Nance is not an adequate class representative because she denied in her deposition that she had ever been a party to a lawsuit, when in fact she had been sued by the defendant law firm in December 1996 to collect a an unpaid credit card bill. Nance says that she recalls that a demand of some sort was made against her and that she resolved the matter quickly and never had to appear in court or hire an attorney; she says that she answered the deposition question as she did because she did not recall having been a party to a lawsuit. We do not find Nance's testimony to be indicative of dishonesty or an inability to understand the proceedings in this case, nor to render her an inadequate class representative.

In sum, plaintiffs' claims are typical of those of the class; they are not subject to any unique defenses that are likely to be a focus of the litigation; based on the material presented to the Court, they have a basic understanding of the nature of the claims; and they have participated as required in the discovery process. *See Sledge*, 182 F.R.D. at 259. In addition, the Court concludes that plaintiffs' counsel, Christopher Langone and Joel Dabisch, are competent and qualified to conduct the litigation vigorously. Defendants object that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 966444 (N.D.Ill.)
**(Cite as: 1999 WL 966444 (N.D.Ill.))**

Page 3

as a small law firm, plaintiffs' counsel do not have staff sufficient to prosecute a class action. The Court, however, has found plaintiffs' counsel to be fully capable of producing and serving on short notice extensive motions and memoranda on important issues in the litigation, indicating that they do, in fact, have an adequate support staff. And as plaintiffs point out, if as a result of class certification they are required to handle large administrative tasks beyond the capability of their in-house staff, these can be contracted out. We conclude that plaintiffs have established that they are adequate class representatives.

Plaintiffs have established each of the four prerequisites to class certification found in Rule 23(a) as well as each of the elements required for certification under Rule 23(b)(3). Their motion for class certification is therefore granted. This matter is set for a status hearing on November 9, 1999 at 9:30 a.m. for submission of either an agreed proposed form of class notice or, if the parties do not reach agreement, separate proposed forms from plaintiffs and defendant.

1999 WL 966444 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

. 1:98CV06720 (Docket)

(Oct. 23, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

--- F.3d ----
--- F.3d ----, 2006 WL 90081 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently
available.

United States Court of Appeals,Seventh
Circuit.
Nancy R. MURRAY, Plaintiff-Petitioner,
v.
GMAC MORTGAGE CORPORATION,
doing business as Ditech.com,
Defendant-Respondent.
**No. 05-8035.**

SUBMITTED Dec. 12, 2005.
DECIDED Jan. 17, 2006.

**Background:** Consumer brought purported
class action against potential creditor that had
accessed her credit history without her
consent, asserting that its loan offer violated
the Fair Credit Reporting Act (FCRA). The
United States District Court for the Northern
District of Illinois, Samuel Der-Yeghiayan, J.,
denied consumer's motion for class
certification, 2005 WL 3019412, as well as
her motion for reconsideration, 2005 WL
3088435. Consumer sought interlocutory
appeal.

**Holdings:** After accepting the appeal, the
Court of Appeals, Easterbrook, Circuit Judge,
held that:

2(1) fact that consumer's counsel did not try to
cut a deal for consumer personally was

insufficient reason to preclude class treatment;

5(2) fact that consumer sought statutory but
not compensatory damages did not warrant
denial of class certification;

8(3) substantial nature of potential damages
award, despite defendant's allegedly
"technical" violations, was not a proper
ground on which to deny class certification;

13(4) consumer's status as a "professional
plaintiff" involved in numerous lawsuits
seeking compensation for alleged FCRA
violations did not justify denial of class
treatment; and

15(5) the Seventh Circuit's decision in *Cole*
did not require an offer's value to be assessed
recipient-by-recipient, so as to foreclose any
possibility of class litigation under FCRA.

Vacated and remanded.

**[1] Federal Courts 170B ☜0**

170B Federal Courts
Court of Appeals has discretion to allow
interlocutory appeals. Fed.Rules
Civ.Proc.Rule 23(f), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☜0**

170A Federal Civil Procedure
Fact that attorney for consumer did not try to

cut a deal for consumer personally was insufficient reason for the district court to preclude class treatment of her action against potential creditor for its alleged violation of the Fair Credit Reporting Act. Consumer Credit Protection Act, § 602 et seq., as amended, 15 U.S.C.A. § 1681 et seq.; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

[3] **Federal Civil Procedure 170A** ☞0

170A Federal Civil Procedure
Plaintiff bringing purported class action acts unethically if he or she uses the class as bait to attract a "better" offer and then cashes in by withdrawing the class claim. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

[4] **Consumer Credit 92B** ☞0

92B Consumer Credit
Tentative settlement of consumer's purported class action against potential creditor under the Fair Credit Reporting Act (FCRA), whereby defendant would put up a fund of $950,000.00 that would be divided between class members and their lawyer, consumer would receive the first $3,000.00, the remaining class members and counsel would divide the rest, and unclaimed funds would be distributed to charity and counsel, was untenable; payment of $3,000.00 to class representative was three times the statutory maximum, other class members would not get even the $100.00 minimum specified by the Act but, instead, would receive less than $1.00 each, and if risk that class would lose justified the compromise that resulted in class members receiving relief worth about one percent of the minimum statutory award, then such risk also mandated that class representative receive a lesser payment. Consumer Credit Protection Act, § 602 et seq., as amended, 15 U.S.C.A. § 1681 et seq.

[5] **Federal Civil Procedure 170A** ☞0

170A Federal Civil Procedure
Fact that consumer sought statutory but not compensatory damages was not sufficient reason for the district court to deny class certification in consumer's action against potential creditor for its alleged violation of the Fair Credit Reporting Act (FCRA); although compensatory damages could be awarded to redress negligence, while statutory damages required willful conduct, introducing the "easier" negligence theory would have precluded class treatment, as common questions no longer would have predominated and an effort to determine a million consumers' individual losses would have made the suit unmanageable. Consumer Credit Protection Act, § 602 et seq., as amended, 15 U.S.C.A. § 1681 et seq.; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

[6] **Federal Civil Procedure 170A** ☞0

170A Federal Civil Procedure
Rule governing class actions was designed for situations in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

[7] **Federal Civil Procedure 170A** ☞0

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 90081 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

Page 3

170A Federal Civil Procedure
In a class action lawsuit, when a few class members' injuries prove to be substantial, they may opt out and litigate independently. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

### [8] Federal Civil Procedure 170A ⊂⇒0

170A Federal Civil Procedure
In consumer's purported class action against potential creditor that had accessed her credit history without her consent for its alleged violation of the Fair Credit Reporting Act (FCRA), the substantial nature of a potential damages award, despite defendant's allegedly "technical" violations, was not a proper ground on which to deny class certification; reason that damages might have been substantial did not lie in any "abuse" by consumer of the rule governing class actions, but in the legislative decisions to authorize awards as high as $1,000.00 per person and to place no cap on the aggregate award to any class, combined with defendant's decision to obtain the credit scores of more than a million persons, and it was not appropriate for the district court judge, who apparently sought to curtail the aggregate damages for violations he deemed trivial, to use procedural devices to undermine the statute. Consumer Credit Protection Act, § 602 et seq., as amended, 15 U.S.C.A. § 1681 et seq.; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

### [9] Statutes 361 ⊂⇒0

361 Statutes
It is not appropriate for a judge to use procedural devices to undermine laws of which he or she disapproves.

### [10] Statutes 361 ⊂⇒0

361 Statutes
While a statute remains on the books, it must be enforced by the court rather than subverted.

### [11] Damages 115 ⊂⇒0

115 Damages
Damages award that would be unconstitutionally excessive may be reduced.

### [12] Federal Civil Procedure 170A ⊂⇒0

170A Federal Civil Procedure
In a class action, constitutional limits on an award of damages are best applied after a class has been certified. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

### [13] Federal Civil Procedure 170A ⊂⇒0

170A Federal Civil Procedure
Consumer's status as a "professional plaintiff" involved in numerous lawsuits seeking compensation for alleged violations of the Fair Credit Reporting Act (FCRA) was not sufficient reason for the district court to deny class treatment in consumer's action against potential creditor for its alleged FCRA violations; consumer did not invite any of the credit offers or entrap any potential creditor into accessing her credit history, but merely opened her mail as it arrived, consumer's decision to sue everyone who accessed that credit history without her consent, rather than just a few, did not injure any other potential

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

borrower, and nothing about the frequency of consumer's litigation implied that she was less suited to represent others than was a person who received and sued on but a single offer. Consumer Credit Protection Act, § 602 ct seq., as amended, 15 U.S.C.A. § 1681 et seq.; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

## [14] Consumer Credit 92B ⌾0

92B Consumer Credit
Under the Fair Credit Reporting Act (FCRA), if a potential lender asks a credit agency for the name and address of every consumer who, since discharge in bankruptcy, has not defaulted on an auto loan or credit-card payment, then an offer of credit to this consumer is "firm" if it enables every non-defaulting recipient to accept; if, however, the credit agency erred and a given person has indeed defaulted on a loan since the discharge, then credit need not be extended. Consumer Credit Protection Act, § 603(l), as amended, 15 U.S.C.A. § 1681a(l).

## [15] Federal Civil Procedure 170A ⌾0

170A Federal Civil Procedure
Consumer could maintain a class action against potential creditor that had accessed her credit history without her consent for its alleged failure to have made the "firm offer of credit" required by the Fair Credit Reporting Act (FCRA); statutory definition of "firm offer" does not ask about how consumers react but, rather, asks what the offeror has done, that is, what terms have been extended and whether they are honored if a consumer accepts, and the Seventh Circuit's decision in

*Cole* did not change the focus from the offeror to the recipient so as to require a recipient-by-recipient evaluation and thereby foreclose any possibility of class litigation under FCRA. Consumer Credit Protection Act, § 603(l), as amended, 15 U.S.C.A. § 1681a(l); Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

Petition for Permission to Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 05 C 1229-Samuel Der-Yeghiayan, Judge.

Daniel A. Edelman, Edelman, Combs & Latturner, Chicago, IL, for Plaintiff-Petitioner. Thomas J. Cunningham, Lord Bissell & Brook, Chicago, IL, for Defendant-Respondent.

Before EASTERBROOK, ROVNER, and WILLIAMS, Circuit Judges.

EASTERBROOK, Circuit Judge.
*1 Shortly after her debts had been discharged in bankruptcy, Nancy Murray received a credit solicitation from GMAC Mortgage, which had learned her name and address by asking credit bureaus to forward information about potential borrowers who met specified criteria. GMACM offered Murray a loan to be secured by a mortgage on her home. Deluged by offers, Murray showed them to a lawyer, who concluded that GMACM had violated the Fair Credit Reporting Act in two ways: first, GMACM had not made the "firm offer of credit" that is essential when a potential lender accesses someone's credit history without that

person's consent, see 15 U.S.C. §
1681b(c)(1)(B)(i); second, GMACM's offer
did not include a "clear and conspicuous"
notice of the recipient's right to close her
credit information to all who lacked her prior
consent, see 15 U.S.C. § 1681m(d)(1)(D).
Murray filed suit, proposing to represent a
class of about 1.2 million recipients of similar
offers from GMACM and demanding
statutory damages, which range from $100 to
$1,000 per person. See 15 U.S.C. §
1681n(a)(1)(A). A recent amendment to the
Act abolishes private remedies for violations
of the clear-disclosure requirement, which in
the future will be enforced administratively,
but that change does not apply to offers made
before its effective date and thus does not
affect this litigation. See 117 Stat.1952,
adding 15 U.S.C. § 1681m(h)(8).

[1] While waiting for the judge to decide
whether the suit could proceed as a class
action, the parties reached a tentative
settlement-which the district judge refused to
read, stating that this would be a waste of time
because he had decided that Murray could not
represent a class. See 2005 U.S. Dist. LEXIS
27254 (N.D.Ill. Nov. 8, 2005), reconsideration
denied, 2005 U.S. Dist. LEXIS 28249 (Nov.
11, 2005). In an effort to save the availability
of class-wide relief, Murray proposes an
interlocutory appeal, which we have discretion
to allow. See Fed.R.Civ.P. 23(f). GMACM,
seeing an opportunity to avoid liability (at
least until another recipient of its offer files
suit), opposes her petition. Meanwhile another
district judge has certified a class in an
essentially identical action. See *Murray v.
New Cingular Wireless Services, Inc.*, 2005

U.S. Dist. LEXIS 29162 (N.D.Ill. Nov. 17,
2005). We accept the appeal, which presents
some fundamental questions about the
management of consumer class actions, in
light of this conflict and the fact that about
two score more of these suits are pending in
the Northern District of Illinois. Because the
papers already filed cover the issues fully, we
proceed directly to decision.

The district court gave four reasons for
declining to certify a class: (1) Counsel did
not try to cut a deal for Murray personally. (2)
The complaint seeks statutory but not
compensatory damages. (3) Statutory
damages, if awarded to a class, would be
ruinously high. (4) Nancy Murray is a
"professional plaintiff" unfit to represent a
class. All but # 4 evince hostility to all class
litigation; if any one were adopted, consumer
class actions under the Fair Credit Reporting
Act would be impossible. None is a proper
ground on which to deny class certification,
however.

**\*2** [2] [3] 1. Let us start with the first. The
district judge wrote: "Murray's interests are
antagonistic to other class members' interests
because Murray may desire to settle her claim
alone. Murray might be able to recover more
funds individually with fewer complications if
she settled individually." Yet every plaintiff
"may desire" to settle alone; if this were
enough to preclude class treatment, there
could be no class actions for damages under
Rule 23(b)(3). The district judge did not point
to any evidence suggesting that Murray *does*
want to settle privately; if she did (and her
lawyers say, without contradiction from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

record, that she doesn't), why launch the suit as a class action? The only answer would be that she wanted to use the class as bait to attract a better offer, then cash in by withdrawing the class claim. If that were her goal (or her lawyer's), it would be unethical, see *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1306 (4th Cir.1978), as well as unrealistic. For unless the statute of limitations had run (which it hasn't), why would GMACM pay Murray to go away when any of a million other recipients could take her place?

[4] Unfortunately, the terms of the tentative settlement suggest that Murray or her lawyers may have tried something worse, negotiating for payment while giving GMACM the benefit of a judgment that leaves the class empty-handed. GMACM agreed to put up a fund of $950,000 that would be divided between the class members and their lawyer. Murray would get the first $3,000; the remaining class members (some 380,000 of whom would receive mailed notice) and counsel would divide the rest. That works out to less than $1 per recipient of GMACM's mailing. Money not claimed from the fund-and, given the tiny sum per person, who would bother to mail a claim?-would be distributed to charity and Murray's lawyers.

This looks like the sort of settlement that we condemned in *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir.1999), and *Crawford v. Equifax Payment Services*, 201 F.3d 877 (7th Cir.2000), two appeals arising from the same litigation. That suit had been settled for $2,000 to the named plaintiff, $5,500 to a legal-aid society that had not been

injured by the defendant's conduct, and $78,000 in legal fees. We treated the disproportion-$2,000 for one class member, nothing for the rest-as proof that the class device had been used to obtain leverage for one person's benefit. See also, e.g., *Young v. Higbee Co.*, 324 U.S. 204, 211-14, 65 S.Ct. 594, 89 L.Ed. 890 (1945); *Weiss v. Regal Collections*, 385 F.3d 337, 343-45 (3d Cir.2004); *Chateau de Ville Products, Inc. v. Tams-Witmark Music Library, Inc.*, 586 F.2d 962, 965-67 (2d Cir.1978). Here the proposed award is $3,000 to the representative while other class members are frozen out. The payment of $3,000 to Murray is three times the statutory maximum, while others don't get even the $100 that the Act specifies as the minimum. Oddly, this is the sort of tactic that the district judge chastised counsel for *not* employing on Murray's behalf.

*3 Such a settlement is untenable. We don't mean by this that all class members must receive $100; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty. See *In re Mexico Money Transfer Litigation*, 267 F.3d 743 (7th Cir.2001). But if the reason other class members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could Murray personally accept 300% of the statutory maximum? And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment to Murray implies, then the failure to

--- F.3d ----
--- F.3d ----, 2006 WL 90081 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

afford effectual relief to any other class member makes the deal look like a sellout. Thus it may well be that Murray is not a good champion, that her law firm (Edelman, Combs, Latturner & Goodwin, LLC) is not an appropriate counsel, or both. But this is the opposite of the district judge's reason (recall that the judge *wanted* Murray to jettison the class for personal benefit), so this consideration cannot sustain the decision.

[5] 2. The district court's second reason-that Murray should have sought compensatory damages for herself and all class members rather than relying on the statutory-damages remedy-would make consumer class actions impossible. What each person's injury may be is a question that must be resolved one consumer at a time. Although compensatory damages may be awarded to redress negligence, while statutory damages require wilful conduct, introducing the "easier" negligence theory would preclude class treatment. Common questions no longer would predominate, and an effort to determine a million consumers' individual losses would make the suit unmanageable. Yet individual losses, if any, are likely to be small-a modest concern about privacy, a slight chance that information would leak out and lead to identity theft. That actual loss is small and hard to quantify is why statutes such as the Fair Credit Reporting Act provide for modest damages without proof of injury.

[6] Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate. See, e.g.,

*Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344-45 (7th Cir.1997). Reliance on federal law avoids the complications that can plague multi-state classes under state law, see *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation,* 288 F.3d 1012 (7th Cir.2002), and society may gain from the deterrent effect of financial awards. The practical alternative to class litigation is punitive damages, not a fusillade of small-stakes claims. See *Mathias v. Accor Economy Lodging, Inc.,* 347 F.3d 672 (7th Cir.2003).

[7] Refusing to certify a class because the plaintiff decides not to make the sort of person-specific arguments that render class treatment infeasible would throw away the benefits of consolidated treatment. Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification. When a few class members' injuries prove to be substantial, they may opt out and litigate independently. See *Jefferson v. Ingersoll International, Inc.,* 195 F.3d 894 (7th Cir.1999). Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether. Cf. *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.1995).

*4 [8] 3. Having upbraided Murray for abandoning compensatory damages and thus seeking too little, the district judge also rebuked her for seeking too much. He wrote: "If Murray and the proposed class members

--- F.3d ----
--- F.3d ----, 2006 WL 90081 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

were to prevail at trial, GMAC would face a potential liability in the billions of dollars for purely technical violations of the FCRA ... Rule 23 is not intended to encourage such abuses of the class action mechanism."

The reason that damages can be substantial, however, does not lie in an "abuse" of Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per person, 15 U.S.C. § 1681n(a)(1)(A), combined with GMACM's decision to obtain the credit scores of more than a million persons.

Many laws that authorize statutory damages also limit the aggregate award to any class. For example, the Fair Debt Collection Practices Act says that total recovery may not exceed "the lesser of $500,000 or 1 per centum of the net worth of the debt collector". 15 U.S.C. § 1692k(a)(2)(B)(ii). The Truth in Lending Act has an identical cap. 15 U.S.C. § 1640(a)(2)(B) (substituting "creditor" for "debt collector"). See also 15 U.S.C. § 1693m(a)(1)(B), 12 U.S.C. § 4010(a)(2)(B), and 12 U.S.C. § 4907(a)(2)(B). Other laws, however, lack such upper bounds. See 15 U.S.C. § 1679g(a) (Credit Repair Organizations Act); 15 U.S.C. § 1667d (Consumer Leasing Act). The Fair Credit Reporting Act is in the cap-free group.

[9] [10] [11] [12] The district judge sought to curtail the aggregate damages for violations he deemed trivial. Yet it is not appropriate to use procedural devices to undermine laws of which a judge disapproves. See *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 686, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987); *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985); *Jaskolski v. Daniels,* 427 F.3d 456, 461-64 (7th Cir.2005). Maybe suits such as this will lead Congress to amend the Fair Credit Reporting Act; maybe not. While a statute remains on the books, however, it must be enforced rather than subverted. An award that would be unconstitutionally excessive may be reduced, see *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), but constitutional limits are best applied after a class has been certified. Then a judge may evaluate the defendant's overall conduct and control its total exposure. Reducing recoveries by forcing everyone to litigate independently-so that constitutional bounds are not tested, because the statute cannot be enforced by more than a handful of victims-has little to recommend it.

[13] 4. The district judge regarded "Murray, her spouse, and their children [as] ... professional plaintiffs. GMAC claims that Murray, her spouse, and their children are participants in more than fifty assorted suits seeking compensation for technical violations of the FCRA which are all being handled by the same law firm. Murray does not deny this fact in her reply. This is ... an indication that Murray and her counsel are merely seeking the 'quick buck' from a class settlement and are not truly interested in vindicating any of the rights of the proposed class members." Murray tells us that she has filed "only" nine suits; her husband and four children filed the rest. Still, the Murrays are in this big time. What the district judge did not explain,

though, is why "professional" is a dirty word. It implies experience, if not expertise. The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders. Neither does GMACM.

*5 A person who seeks out opportunities to sue could do so in ways that injure other class members. Consider the investor who buys one share in each of a thousand corporations, hoping that the price of one will plummet and lead to securities litigation. Such a person could be tempted to file suits designed to extract payoffs from the corporation even if the average investor will lose in the process. Congress has responded by insisting that the investors with the largest stakes be allowed to control securities litigation. 15 U.S.C. § 78u-4(a)(2)(A). The Fair Credit Reporting Act lacks any restrictions along these lines.

Murray did not accept compensation to put herself in the way of injury-though "testers," who do this in housing and employment litigation, usually are praised rather than vilified. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374-75, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Murray just opened the mail as it arrived. She did not invite any of the offers or entrap any potential creditor into accessing her credit history. Her decision to sue everyone who accessed that credit history without her consent, rather than just a few, does not injure any other potential borrower. Nothing about

the frequency of Murray's litigation implies that she is less suited to represent others than is a person who received and sued on but a single offer. Repeat litigants may be better able to monitor the conduct of counsel, who as a practical matter are the class's real champions.

[14] 5. GMACM asks us to affirm the district judge's order on an alternative ground. One of the contested questions is whether GMACM used credit information to make a "firm offer of credit," which is one of the few permissible purposes for which this information may be secured without the consumer's consent. The statute defines "firm offer of credit" as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a [credit] report on the consumer, to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. § 1681a(*l* ). In other words, if a potential lender asks for the name and address of every consumer who, since discharge in bankruptcy, has not defaulted on an auto loan or credit-card payment, then an offer of credit to this consumer is "firm" if it enables every non-defaulting recipient to accept; if, however, the credit agency erred and a given person has indeed defaulted on a loan since the discharge, then credit need not be extended. 15 U.S.C. § 1681a(*l* )(2).

[15] According to GMACM, a court cannot know whether a "firm offer of credit" has been made without examining every recipient's circumstances, and the need to do this for 1.2 million people would make class treatment impractical. The statutory definition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 90081 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

of "firm offer" does not ask about how consumers *react,* however; it asks what the offeror has done-what terms have been extended, whether they are honored if a consumer accepts.

**\*6** GMACM maintains that *Cole v. U.S. Capital, Inc.,* 389 F.3d 719 (7th Cir.2004), changed the focus from the offeror to the recipient and in the process foreclosed any possibility of class litigation under the Fair Credit Reporting Act. We held in *Cole* that a sham offer used to pitch a product rather than extend credit does not meet the statutory definition. A business that obtains consumer credit information and then offers a $1 loan (at 100% daily interest) toward the purchase of a car has not made a "firm offer *of credit* " but has instead used credit histories to identify potential auto buyers. That objective is not allowed under the Fair Credit Reporting Act, we concluded in *Cole.*

To separate the use of credit data to sell products (forbidden) from the use of credit data to make firm offers of credit (allowed), we held, a court must determine whether the offer has value as an extension of credit alone. "A definition of 'firm offer of credit' that does not incorporate the concept of value to the consumer upsets the balance Congress carefully struck between a consumer's interest in privacy and the benefit of a firm offer of credit for all those chosen through the pre-screening process. From the consumer's perspective, an offer of credit without value is the equivalent of an advertisement or solicitation." *Id.* at 726-27. To understand "the consumer's perspective," however, a court

must hold 1.2 million hearings-or so GMACM contends.

GMACM offered the recipients first-mortgage loans, so that they could draw cash against the equity in their homes. Because the loan could not exceed the unencumbered portion of the property's market price, however, not all consumers would find the opportunity valuable. Some would not have enough equity to justify acceptance; others could conclude that the costs of refinancing (required so that GMACM could hold the senior mortgage) exceed the benefit from drawing additional credit.

We do not read *Cole,* however, to require a consumer-by-consumer evaluation. An offer has value to "the consumer" if it is useful to the *normal* consumer. *Cole* 's objective was to separate *bona fide* offers of credit from advertisements for products and services, determining from "*all* the material conditions that comprise the credit product in question ... [whether it] was a guise for solicitation rather than a legitimate credit product". *Id.* at 728 (emphasis in original). That depends on the terms of the offer, not on recipients' idiosyncratic circumstances. How else could someone in GMACM's position know whether it was lawful to obtain credit information in the first place?

In order to avoid class certification, GMACM has adopted a position that would make it impossible for any potential lender to know *ex ante* whether it is entitled to obtain credit information. Any recipient could appear, assert that the offer was worthless given his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2006 WL 90081 (C.A.7 (Ill.))
(Cite as: --- F.3d ----)

financial circumstances, and obtain damages if not an injunction. Such a rule would cripple the statutory regime by making offers of credit so risky that any prudent, law-abiding firm would have to withdraw from the business. To escape one suit, GMACM would hobble its own operations and those of all others who rely on the firm-offer proviso to the Fair Credit Reporting Act. That would disserve the interests of both lenders and consumers. Nothing in *Cole* requires an offer's value to be assessed *ex post*, and recipient by recipient. To decide whether GMACM has adhered to the statute, a court need only determine whether the four corners of the offer satisfy the statutory definition (as elaborated in *Cole* ), and whether the terms are honored when consumers accept. These questions readily may be resolved for a class as a whole.

*7 The decision of the district court is vacated, and the case is remanded for proceedings consistent with this opinion. Circuit Rule 36 will apply on remand. We strongly suggest that the Executive Committee of the Northern District assign all of the Murray family's suits under the Fair Credit Reporting Act to a single judge, to ensure consistent handling.

C.A.7 (Ill.),2006.
Murray v. GMAC Mortg. Corp.
--- F.3d ----, 2006 WL 90081 (C.A.7 (Ill.))

Briefs and Other Related Documents (Back to top)

• 05-8035 (Docket) (Nov. 22, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

# Westlaw.

Slip Copy
Slip Copy, 2005 WL 1243428 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 1

# H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.
Ann MUNIZ, Ed Muniz, Joseph Shroka, and Diane Shroka, individually and on behalf of all others similarly situated, Plaintiffs,
v.
REXNORD CORPORATION; Ames Supply Co.; The Money Corporation; Scot Incorporated; Lindy Manufacturing Co.; Precision Brand Products, Inc.; Tricon Industries, Inc.; and Magnetrol International, Inc., Defendants.
**No. 04 C 2405.**

Feb. 10, 2005.

Myron M. Cherry, Myron M. Cherry & Associates, James D. Brusslan, Levenfield Pearlstein, Patrick J. Sherlock, Attorney at Law, Chicago, IL, Andrew Sher, The Sher LawFIrm PLLC, Bill Robins, III, Heard, Robins, Cloud, Lubel & Greenwald, Houston, TX, David Sandoval, J. Christopher Dean, Heard Robins Cloud Lubeh & Greenwood LLP, Santa Fe, NM, for Plaintiffs.
Steven P. Handler, Mark Alan Bilut, Todd Richard Wiener, McDermott, Will & Emery LLP, Alan P. Bielawski, Bryant Todd Lamer, J. Andrew Schlickman, William Gust Dickett, Sidley Austin Brown & Wood LLP, Scott Gene Early, Christopher J. Werner, Gary S. Rovner, Foley & Lardner, Edward V. Walsh, III, Sachnoff & Weaver, Ltd., Pamela Reasor Hanebutt, Eimer Stahl Klevorn & Solberg, LLP, Alan Bruce White, John William Kalich, Mark D. Erzen, Karaganis, White & Magel Ltd., Carol Mahoney Douglas, Ungaretti & Harris, Michael John Maher, Elizabeth Schroer Harvey, James Christopher Adamson, John Paul Arranz, Swanson, Martin & Bell, Eric L. Samore, Molly Anne Caprez, O'Hagan, Smith & Amundsen, L.L.C., Peter Vincent Baugher, Jennifer A. Waters, Schopf & Weiss, Joseph A. Strubbe, Vedder, Price, Kaufman & Kammholz, P.C., Mark Anthony Latham, Sasha Marie Engle, Sheila H. Deely, Gardner Carton & Douglas LLP, Brett David Heinrich, Matthew E. Cohn, Peter Petrakis, Meckler, Bulger & Tilson, Nancy J. Rich, Jon Preston Sanders, Laura A. O'Connell, Russell B. Selman, Katten Muchin Rosenman LLP, Jeremiah P. Connolly, Michelle Ann Bacher, Bollinger, Ruberry and Garvey, Emily Auld Patterson, Sidley Austin Brown & Wood LLP, Chicago, IL, Michael S. Blazer, Thomas S. Yu, Tracey A. Dillon, The Jeff Diver Group, L.L.C., Wheaton, IL, Carey S. Rosemarin, Law Offices of Carey S. Rosemarin, Northbrook, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

DARRAH, J.

\*1 Plaintiffs filed a multi-count class action suit against Defendants, alleging Defendants contaminated drinking water with cancer-causing pollutants by dumping such contaminants in the water supply. Count I seeks response costs pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended. Count II seeks relief under the Resource Conservation and Recovery Act. Count III alleges a nuisance, and Count IV alleges trespass. Count V alleges a claim for strict liability of an ultrahazardous activity. Count VI alleges a claim of *res ipsa loquitur*. Count VII alleges a claim of negligence, and Count VIII alleges a claim of negligence based on statutory violations. Lastly, Count IX alleges a claim of willful and wanton misconduct. Presently before the Court is Plaintiffs' Motion for Class Certification.

The underlying facts are fully set forth in this Court's previous disposition addressing a motion of one of the Defendants to strike or sever and stay Count II of the Third-Party Complaint of another Defendant. Accordingly, they need not be repeated here.

Plaintiffs' proposed class is defined as:
All persons who currently, or in the past, own(ed) or reside(d), on property within the area bounded by Inverness to the north, 63rd Street to the south, Dunham

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1243428 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 2

Street to the east, and Interstate 355 to the west whose
properties have been impacted, or a threat exists that it
will be impacted, by hazardous substances released
within the Ellsworth Industrial Site. [FN1]

> FN1. In their reply brief, Plaintiffs concede
> that generally class action suits involving
> environmental contamination claims where
> class members will likely have differing
> monetary damages are typically certified as to
> liability, and the issue of monetary damages is
> reserved for individualized treatment.
> Accordingly, class certification in the instant
> case will be limited to the issue of liability.
> See *Mejdreck v. The Lockformer Co.,* 2002
> WL 1838141 (N.D.Ill. Aug.12, 2002);
> *Leclercq v. The Lockformer Co.,* 2001 WL
> 198840 (N.D.Ill. Feb. 28, 2001).

To receive class certification, Plaintiffs must satisfy all
four elements of Rule 23(a), which include: numerosity,
commonality, typicality, and adequacy of
representation. Fed.R.Civ.P. 23(a). Plaintiffs must also
satisfy at least one of the three provisions under Rule
23(b).

The propriety of class certification is a separate issue
than whether the plaintiff will ultimately prevail on the
merits of its claims. See *Eisen v. Carlisle & Jacquelin,*
417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732
(1974). However, "[t]he proposition that a district judge
must accept all of the complaint's allegations when
deciding whether to certify a class cannot be found in
Rule 23 and has nothing to recommend it." *Szabo v.
Bridgeport Machines, Inc.,* 249 F.3d 672, 675 (7th
Cir.2001) (*Szabo* ). Before certifying a class, "a judge
should make whatever factual and legal inquiries are
necessary under Rule 23." *Szabo,* 249 F.3d at 676. For
example, a district court would not be free to accept an
allegation of 10,000 class members for purposes of
numerosity in the face of a dispute on that point. See
*Szabo,* 249 F.3d at 676. Accordingly, the Court does
not determine the substantive strength or weakness of
the allegations in the complaint but rather the merits of
the allegations only as they bear on the suitability of a

class action suit under Rule 23(a) and (b). See *Rahim v.
Sheahan,* 2001 WL 1263493 at *10 (N.D.Ill. Oct.19,
2001).

### Numerosity

**\*2** Rule 23(a)(1) requires that the class be so numerous
that joinder of all the members is impracticable.
Fed.R.Civ.P. 23(a)(1). Plaintiffs need not demonstrate
the exact number of class members so long as a
conclusion is apparent from good-faith estimates
(*Peterson v. H & R Block Tax Servs.,* 174 F.R.D. 78, 81
(N.D.Ill.1997)); and the court is entitled to make
"common sense assumptions" in order to support a
finding of numerosity (*Grossman v. Waste
Management, Inc.,* 100 F.R.D. 781, 785
(N.D.Ill.1984)).

Plaintiffs allege a class size in excess of 800 persons.
The Defendants do not dispute this number.
Accordingly, the numerosity requirement is satisfied.

### Commonality and Typicality

Commonality exists if the class members share common
questions of law or fact. The requirement is usually
satisfied when a common nucleus of operative facts
unites a class. *Rosario v. Livaditis,* 963 F.2d 1013,
1018 (7th Cir.1992). The presence of some factual
variations among the class members does not defeat
commonality so long as there is at least one question of
law or fact common to the class. *Rosario,* F.2d at 1017.

The typicality requirement of Rule 23(a)(3) is closely
related to the commonality requirement of Rule
23(a)(2). *Ruiz v. Stewart Associates, Inc.,* 171 F.R.D.
238, 242 (N.D.Ill.1997). A plaintiff's claim is typical if
it arises from the same event or practice or course of
action that gives rise to the claims of other class
members and if his or her claims are based on the same
legal theory. *Rosario,* 963 F.2d at 1018.

Here, Plaintiffs allege that Defendants occupied,
operated, and controlled property within the Ellsworth
Industrial Park. Defendants used chlorinated solvents

and other hazardous solvents over several years, which have spilled into the soil and groundwater. The hazardous substances from each of the Defendants' properties have commingled and migrated, and continue to migrate, in liquid and vapor form, in a groundwater plume running from Defendants' properties toward and into Plaintiffs' properties, contaminating, infiltrating and threatening the soil, groundwater, domestic water supply and indoor air quality of the homes in the area.

Plaintiffs contend that the "core questions" are "whether or not and to what extent Defendants caused contamination of the area in question. Common questions of fact and law to the proposed class include: (1) whether the Defendants used certain harmful chemicals in the operations of its business, (3) whether each Defendant contributed to the contamination within the Ellsworth Industrial Superfund Site, and (4) the nature and extent of harms and threats of harm caused by the Defendants to the class area and the environment.

The Defendants argue that Plaintiffs do not meet the commonality or typicality requirement because the Defendants are located in different areas within the industrial park, and the Plaintiffs' properties are located in different areas. While these differences exist, the underlying questions of whether or not the Defendants' conduct caused contamination in the area and, if so, to what extent Defendants should be held liable remain. Plaintiffs need not be identical-certification is permissible if plaintiffs allege that defendants engaged in some standardized conduct towards the proposed class. See _Mejdreck v. The Lockformer Co., 2002 WL 1838141 (N.D.Ill. Aug.12, 2002)_ (_Mejdreck_) (finding differences in class members' types of homes and whether some plaintiffs tested negative for contamination did not "overshadow" common operative fact of defendant's liability for contaminating property), _aff'd, 319 F.3d 910 (7th Cir.2003); Ludwig v. Pilkington North Am., Inc., 2003 WL 22478842 (N.D.Ill. Nov.4, 2003)_ (_Ludwig_ ) (factual differences between class members, such as differing levels and sources of arsenic contamination, not great enough to destroy common questions presented by plaintiffs of whether Defendant mishandled waste and whether the waste migrated to class members' properties).

*3 Defendants also argue that commonality and typicality do not exist because of the complex hydrogeology in the area. However, this argument goes directly to the merits of the claims against the varying Defendants, as demonstrated by Plaintiffs' references to reports and data contrary to Defendants' assertion, and does not alter the underlying question of liability and the common nucleus of underlying facts. See _Mejdreck, 2002 WL 183141 at *3-4; Leclercq v. The Lockformer Co.,_ 2001 WL 198840 (N.D.Ill. Feb. 28, 2001) (variation in amount of contamination in proposed class members' wells goes to merits of claims and does not destroy commonality via a common course of conduct that results in an injury to the class as a whole).

Defendants argue that the commonality and typicality requirements are also not met because of the existence of a defense unique to the named Plaintiffs-waiver of their claims via a Water Services Agreement. A unique defense may destroy typicality where the defenses against a named plaintiff are likely to consume a significant portion of the litigant's time and energy and where there is a danger that preoccupation with defenses unique to the representatives will cause absent class members to suffer. See _In re Systems Software Assoc., Inc.,_ 2000 WL 1810085 (N.D.Ill.Dec.8, 2000). In the instant case, the claimed defense of waiver per the Water Services Agreement does not appear to be unique as to the named Plaintiffs as most of the proposed class that were required to obtain water from Downers Grove were required to execute the Water Services Agreement. Furthermore, the defense should not require a significant amount of time to resolve or detract attention from absent class members' claims. See _Gaspar v. Linvatec Corp.,_ 167 F.R.D. 51, 58 (N.D.Ill.1996) (defenses of release, tender of laches unique to some class members did not prohibit finding of typicality); _In re Systems Software Assoc., Inc.,_ 2000 WL 1810085 at *2 (defenses of dismissal from suit or release insufficient to prohibit finding of typicality).

As to commonality and typicality, Defendants argue that the class certification is improper because Plaintiffs do not allege a single source of conduct to be the proximate cause of the contamination of all the properties. Contrary to Defendants' argument, the Plaintiffs do allege the same general conduct by the

Slip Copy
Slip Copy, 2005 WL 1243428 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 4

Defendants-dumping dangerous chemicals that have commingled into the groundwater and impacted the entire class. Accordingly, commonality and typicality exist. *See Ludwig,* 2003 WL 22478842 at *5 (commonality requirement met because claims of multiple sources and methods of contamination constituted a single course of conduct of disposing harmful waste); *Mejdreck,* 2002 WL 1838141 at *3 (plaintiffs' allegation that defendants allowed chemical to contaminate the soil, groundwater, and property constitutes standardized conduct by the defendants towards the proposed class members; therefore, common questions of law and fact exist); *Leclercq,* 2001 WL 199840 at *3 (typicality requirement met because the defendants' alleged course of conduct-the misuse and mishandling of chemical by the defendants-was the same for all of the proposed class members and caused the same damage).

### Adequacy of Representation

**\*4** The class representatives must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In determining adequacy of class representation, the court considers (1) whether any conflicts of interest exist between the named plaintiffs and the class members and (2) whether the named plaintiffs' counsel will adequately protect the interests of the class. *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 58 (N.D.Ill.1996).

Defendants do not argue that Plaintiffs' counsel would not provide adequate class representation. However, Defendants argue that the named Plaintiffs are inadequate class representatives because they are not seeking all potential claims of all class members-personal injury claims due to the alleged release of hazardous chemicals.

"[A] class action judgment ... binds class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action." *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 880, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Accordingly, a class action suit seeking damages for property damage

would not bar and/or prejudice any personal injury claims that the class members may have. *See Bentley v. Honeywell Int'l Inc.,* 223 F.R.D. 471, 483 (S.D.Ohio 2004) (*Bentley* ); *see also, Clancey v. McBride,* 338 Ill. 35, 40, 169 N.E. 729 (1929) (judgment for property damage does not bar later suit for personal injury). Accordingly, Plaintiffs are adequate class representatives.

### >Rule 23(b)(3)

Plaintiffs seek class certification under Rule 23(b)(3). Rule 23(b)(3) provides that a class action may be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to the available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

Defendants' primary arguments against certification pursuant to Rule 23(b)(3) mirror their arguments against a finding of commonality and typicality. As discussed above, Plaintiffs have alleged that the Defendants engaged in a single course of conduct, disposal of hazardous chemicals, that has created a common nucleus of facts for the class. While some individualized questions exist, they do not prevent class certification. *See Ludwig,* 2003 WL 22478842 at *4-5 (common question whether defendants mishandled waste, even though alleged to be via multiple sources and methods, that contaminated plaintiffs' properties predominated over individualized questions); *Mejdreck,* 2002 WL 1838141 at *6-7; *Leclercq,* 2001 WL 199840 at *7; *Bentley,* 223 F.R.D. at 486-87.

Furthermore, a class action is superior to the available methods for the fair and efficient adjudication of this controversy. *See Ludwig,* 2003 WL 22478842 at *5; *Mejdreck,* 2002 WL 1838141 at *7; *Leclercq,* 2001 WL 199840 at *7; *Bentley,* 223 F.R.D. at 488 (collectively, finding that class action is superior form of adjudication of case involving contamination of property by a hazardous chemical). Accordingly, the Court finds that the requirements of Rule 23(b)(3) are met.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1243428 (N.D.Ill.)
**(Cite as: Slip Copy)**

*5 For the foregoing reasons, Plaintiffs' Motion for Class Certification is granted. The certified class shall be defined as:

All persons who currently, or in the past, own(ed) or reside(d), on property within the area bounded by Inverness to the north, 63rd Street to the south, Dunham Street to the east, and Interstate 355 to the west whose properties have been impacted, or a threat exists that it will be impacted, by hazardous substances released within the Ellsworth Industrial Site.

N.D.Ill.,2005.
Muniz v. Rexnord Corp.
Slip Copy, 2005 WL 1243428 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3286564 (Trial Pleading) Notice of Filing (Oct. 31, 2005)
• 2005 WL 3286571 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss Count IV of Fourth Party Complaint (Oct. 31, 2005)
• 2005 WL 3285812 (Trial Pleading) Principal Manufacturing Corporation's Answer to Cross-Claim of Helwig and Downers Grove National Bank (Oct. 11, 2005)
• 2005 WL 2869704 (Trial Pleading) Rexnord Industries, Inc.'s Answer and Affirmative Defenses to RHI Holdings, Inc.'s Counterclaim (Sep. 07, 2005)
• 2005 WL 2610679 (Trial Pleading) Rhi Holdings, Inc. and the Fairchild Corporation's Answer, Affirmative Defenses, and Couonterclaim to Rexnord's First Amended Third-Party Complaint (Aug. 24, 2005)
• 2004 WL 2820304 (Trial Motion, Memorandum and Affidavit) Third-Party Defendants' Reply in Support of Their Motion to Strike or Stay Count II of Rexnord's Third-Party Complaint (Oct. 20, 2004)
• 2004 WL 2820296 (Trial Motion, Memorandum and Affidavit) Rexnord Industries, Inc.'s Response to RHI Holdings, Inc.'s and the Fairchild Corporation's Motion to Strike or Stay Count II (Sep. 29, 2004)
• 2004 WL 2820299 (Trial Pleading) Third-Party Complaint (Sep. 15, 2004)
• 2004 WL 2820291 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Amended Motion for Class Certification (Sep. 03, 2004)

• 2004 WL 2820286 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of RHI Holdings, Inc.'s and the Fairchild Corporation's Motion to Strike or Stay Count II of Rexnord Corporation's Third-Party Complaint (Aug. 11, 2004)
• 2004 WL 2820276 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Joint Motion to Dismiss Count II (Rcra) and to Strike and Dismiss Certain Claims (Jul. 23, 2004)
• 2004 WL 2820282 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Alternative Joint Motion to Strike Class Allegations in Count II (Jul. 23, 2004)
• 2004 WL 2820268 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Joint Motion to Dismiss Count II (Rcra) and to Strike and Dismiss Certain Claims (Jun. 30, 2004)
• 2004 WL 2820271 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Alternative Joint Motion to Strike Class Action Allegations in Count II (Jun. 30, 2004)
• 2004 WL 2820263 (Trial Pleading) Rexnord Industries, Inc.'s Third Party Complaint Against RHI Holdings, Inc. & the Fairchild Corporation (Jun. 07, 2004)
• 2004 WL 2820209 (Trial Pleading) Defendant Lindy Manufacturing Company's Answer and Defenses to the Class Action Complaint (May. 28, 2004)
• 2004 WL 2820218 (Trial Pleading) Answer and Affirmative Defenses of Defendant Precision Brand Products, Inc. (May. 28, 2004)
• 2004 WL 2820225 (Trial Motion, Memorandum and Affidavit) Joint Motion to Dismiss Count II (Rcra) and to Strike and Dismiss Certain Claims (May. 28, 2004)
• 2004 WL 2820231 (Trial Pleading) Rexnord Industries, Inc.'s Answer and Affirmative Defenses to All Counts of Class Action Complaint Except Count II (May. 28, 2004)
• 2004 WL 2820237 (Trial Pleading) Answer by Defendant the Morey Corporation (May. 28, 2004)
• 2004 WL 2820246 (Trial Pleading) Answer and Affirmative Defenses of Magnetrol International, Inc. (May. 28, 2004)
• 2004 WL 2820250 (Trial Pleading) Answer and Separate Defenses of Defendant Ames Supply Company (May. 28, 2004)
• 2004 WL 2820254 (Trial Pleading) Answer and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 6
Slip Copy, 2005 WL 1243428 (N.D.Ill.)
**(Cite as: Slip Copy)**


Additional Defenses of Tricon Industries (May. 28,
2004)

• 2004 WL 2820259 (Trial Pleading) Defendant Scot
Incorporated's Answer and Affirmative Defenses (May.
28, 2004)

• 2004 WL 1070509 (Trial Pleading) Class Action
Complaint (Apr. 02, 2004)

• 2004 WL 2820197 (Trial Pleading) Class Action
Complaint (Apr. 02, 2004)

• 1:04cv02405 (Docket) (Apr. 02, 2004)

• 2004 WL 3568476 (Trial Pleading) Cross-Claim of
William F. Helwig and Downers Grove National Bank
as Trustee of Trust Number 85-77 Against Principal
Manufacturing Corporation (Jan. 01, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5



# SHERMAN FINANCIAL GROUP
# ALEGIS GROUP, L.P.

## AGENCY MANUAL

1

PLTS 1032

# TABLE OF CONTENTS

## THE SHERMAN ORGANIZATION ............................................................................. 4

### AGENCY SELECTION AND QUALIFICATIONS ............................................................. 5

INTRODUCTION ............................................................................................................. 5
LICENSING REQUIREMENTS ............................................................................................. 5
DUE DILIGENCE QUESTIONS ............................................................................................ 6
AGENCY SCORECARD ...................................................................................................... 6
DOCUMENT REQUESTS .................................................................................................... 6

### TRANSFER PROCESS ....................................................................................................... 7

MARKET SHARE .............................................................................................................. 7
NOTIFICATION ................................................................................................................ 7
DELIVERY OF PLACEMENT FILES ..................................................................................... 7
CHARGING INTEREST ...................................................................................................... 7

### REPORTING REQUIREMENTS ....................................................................................... 8

GENERAL ...................................................................................................................... 8
BATCH TRACK ............................................................................................................... 8
BATCH TRACK ILLUSTRATION ......................................................................................... 8
RECAP REPORTS ............................................................................................................ 8
RECAP REPORT ILLUSTRATION ........................................................................................ 8
STATUS AND INFORMATION UPDATE FILE (A.K.A EXT FILE) ............................................. 9
AVERAGE SETTLEMENT PERCENTAGE (A.K.A. SIF/PIF LOG) ........................................... 10
COLLECTOR ACTIVITY REPORTS .................................................................................... 10

### FEES .............................................................................................................................. 10

### WORK STANDARDS ...................................................................................................... 10

WORK STANDARDS GRID ............................................................................................... 10
FIRST COLLECTIONS LETTER .......................................................................................... 10

### CLOSE & RETURN OF ACCOUNTS ............................................................................ 11

GENERAL .................................................................................................................... 11
CONSUMER CREDIT COUNSELING ACCOUNTS ................................................................. 11
DECEASED ACCOUNTS .................................................................................................. 11
BANKRUPT ACCOUNTS ................................................................................................. 11
DISPUTES .................................................................................................................... 12
CEASE AND DESIST ...................................................................................................... 12
PAID PRIOR / FRAUD ACCOUNTS ................................................................................... 12
RECALLS ..................................................................................................................... 12

### MEDIA REQUESTS ....................................................................................................... 13

### FINANCIAL MANAGEMENT ....................................................................................... 13

REMITTANCE FILE ....................................................................................................... 13
MONTH END SCHEDULE ................................................................................................ 14
PAY DIRECTS ............................................................................................................... 14
BANK WIRE INSTRUCTIONS ........................................................................................... 14

PLTS 1033

**AUDIT** ........................................................................................................................................ **14**

   SITE VISIT SCHEDULE ................................................................................................................ **14**

**POINTS OF CONTACT** .............................................................................................................. **14**

   GENERAL ...................................................................................................................................... **14**
      *John Olson* ................................................................................................................................ *14*
      *Amanda Smith* ........................................................................................................................... *15*
   ACCOUNT INQUIRIES ................................................................................................................ **15**
      *Kay Myers* ................................................................................................................................ *15*
   TECHNICAL ISSUES (BEFORE PLACEMENT) ........................................................................ **15**
      *Jody Geter* ................................................................................................................................ *15*
   REMITTANCE ISSUES ............................................................................................................... **16**
      *Peter Conover* ........................................................................................................................... *16*

**APPENDIX 1 - DUE DILIGENCE QUESTIONNAIRE** ............................................................ **17**

   AGENCY PROFILE ...................................................................................................................... **17**
      *COMPANY HISTORY* ............................................................................................................... *17*
      *COMPANY'S PERSONNEL HISTORY* ...................................................................................... *17*
      *Pending Lawsuits:* ..................................................................................................................... *18*
      *Outstanding Judgments:* ............................................................................................................ *18*
      *Top Ten Issuers:* ....................................................................................................................... *18*
      *National Coverage:* ................................................................................................................... *18*
      *MINORITY/WOMEN BUSINESS CLASSIFICATION* .................................................................. *18*
   GENERAL DESCRIPTION .......................................................................................................... **19**
   GENERAL ACCOUNT PROCESSING ........................................................................................ **19**
   COMMUNICATIONS .................................................................................................................. **20**
   ARRANGEMENTS ....................................................................................................................... **20**
   VOLUME CAPACITY .................................................................................................................. **21**
   PAYMENTS PROCESSING / HANDLING ................................................................................. **21**
   COLLECTION STAFF ................................................................................................................. **21**
   CUSTOMER DISPUTES AND COMPLAINTS ............................................................................ **22**
   INSURANCE AND BONDING ..................................................................................................... **22**

**APPENDIX 2 – COLLECTION AGENCY AGREEMENT** ....................................................... **23**

   ARTICLE 1: RIGHTS AND DUTIES OF ALEGIS ..................................................................... **23**
   ARTICLE 2: RIGHTS AND DUTIES OF AGENCY ................................................................... **24**
   ARTICLE 3: TERMINATION ..................................................................................................... **25**
   ARTICLE 4: PAYMENT REMITTANCES .................................................................................. **25**
   ARTICLE 5: REMUNERATION ................................................................................................. **26**
   ARTICLE 6: INDEMNIFICATION, INSURANCE, AND LIMITATION OF LIABILITY .............. **26**
   ARTICLE 7: CONFIDENTIALITY ............................................................................................. **28**
   ARTICLE 8: NON COMPETITION, LIQUIDATED DAMAGES .................................................. **29**
   ARTICLE 9: PERIODIC EXAMINATIONS OF AGENCY .......................................................... **30**
   ARTICLE 10: REPRESENTATIONS AND WARRANTIES ........................................................ **30**
   ARTICLE 11: FINANCIAL STATEMENTS AND CHANGE OF OWNERSHIP ........................... **31**
   ARTICLE 12: GENERAL ........................................................................................................... **31**
   ARTICLE 13: PRIVACY OF CONSUMER FINANCIAL INFORMATION .................................. **32**

**APPENDIX 3 – SAMPLE CONTRACT ADDENDUM** ............................................................ **37**

**APPENDIX 4 - BATCH TRACK ILLUSTRATION** .................................................................. **38**

**APPENDIX 5 - RECAP REPORT ILLUSTRATION** ................................................................ **39**

**APPENDIX 6 – FIRST COLLECTION LETTER** ...................................................................... **40**

3

EXHIBIT A................................................................................................................................................40
EXHIBIT A-1 ............................................................................................................................................41

APPENDIX 7-WORK STANDARDS GRID............................................................................................43

APPENDIX 8-PAYMENT FILE SPECIFICATIONS ..............................................................................46

APPENDIX 9-STATUS AND INFORMATION UPDATE FILE SPECIFICATIONS (A.K.A. EXT FILE)....47

APPENDIX 10-PLACEMENT FILE SPECIFICATIONS (A.K.A. PLX FILE) ..........................................49

APPENDIX 11-PAY DIRECT FILE SPECIFICATIONS...........................................................................51
   HEADER RECORD: TYPE 0 ..................................................................................................................51
   TRAILER RECORD: TYPE 99 ...............................................................................................................51
   FINANCIAL RECORD: TYPE 4...............................................................................................................52



## The Sherman Organization

Sherman Financial Group LLC ("Sherman") is an integrated company engaged in the business of purchasing, servicing, and securitizing distressed consumer debt such as credit card loans, all types of debt in a Chapter 13 bankruptcy plan, telecommunications receivables, student loans, auto and mortgage deficiencies, and high LTV second mortgages.

Sherman's New York office is the center for all capital markets functions such as sourcing product, managing seller/client relationships, pricing portfolios and securitizing assets. Sherman seeks to forge long term, mutually beneficial relationships with our seller/clients and to provide them with competitive pricing as well as superior customer service.

Recoveries are administered through Alegis Group, L.P., a Houston, TX based receivables collection company with offices in Greenville, SC and Baltimore, MD as well as Houston. Specialized receivables such as bankrupt credit card accounts and high-LTV mortgages are managed by Resurgent Capital

4

PLTS 1035

Services in Greenville, SC. Part of Sherman's strategy is to perpetually outsource a substantial portion of its purchased receivables. To this end, Sherman, through its operating companies, will work with numerous collection agencies in much the same way as a traditional credit grantor. These relationships are managed out of the Greenville, SC office of Alegis Group, L.P.

Sherman Financial Group LLC is owned by management, Mortgage Guaranty Insurance Corp. ("MGIC") and Enhance Financial Services Group Inc. ("Enhance"). MGIC is the leading provider of private mortgage insurance in the United States, with a market capitalization of over $6.0 billion. Enhance is a holding company for various insurance, reinsurance and non-insurance-related businesses, with a market capitalization of over $600 million as of August 2000. MGIC and Enhance provide a substantial source of capital and expertise to the venture.

## Agency Selection and Qualifications

### Introduction

Agencies are selected based on their reputation in the marketplace, capacity, and level of operational and technical sophistication. Prior to entering into an agreement with a prospective agency, on-site due diligence is conducted by Alegis personnel. During the due diligence visit, access to the operations manager who will be responsible for our placements, the probable team leader(s) and several collectors would be required. In addition to the on-site due diligence performed, the following is a set of questions and documentation requests that would aid in our evaluation. Please have the appropriate person type in the responses to the questions in Appendix 1, as well as assemble the information requested. For convenience, upon request we would be happy to provide the questions in a Word document to allow the respondent to answer the questions in a word processing program for submission to us.

### Licensing Requirements

Sherman Financial requires licenses and or bonding in conjunction with the ACA guidelines. Please provide current license information to your agency manager as a prerequisite to account placement. In some instances, Sherman will accept a "waiver" letter from the state in place of the license.

License renewals should be sent to Sherman on an ongoing basis. Direct any questions to your Agency Manager or the Agency Auditor.

The following are the states and cities Sherman requires each agency to be licensed:

| | |
|---|---|
| Alaska | Mississippi |
| Arizona | Nebraska |
| Arkansas | Nevada |
| Colorado | New Jersey |
| Connecticut | New Mexico |
| Delaware | North Carolina |
| Florida | North Dakota |
| Hawaii | Oregon |
| Idaho | Tennessee |

5

| | |
|---|---|
| Illinois | Texas (bond) |
| Indiana | Utah |
| Louisiana | Washington |
| Maine | West Virginia |
| Maryland | Wisconsin |
| Massachusetts | Wyoming |
| Michigan | New York City |
| Minnesota | City of Buffalo |

### *Due Diligence Questions*
(See Appendix 1)

### *Agency Scorecard*

Sherman Acquisition uses a scorecard to evaluate the attributes of the Agency. The following is a list of items reviewed and their weight as it relates to you overall rating. The scorecard takes various attributes within a collection organization such as fees, management experience, capacity etc. In addition to the scoring model Sherman will review the agencies Dun and Bradstreet, FTC and references.

### *Document Requests*

There are certain reports we will require, and we know that you probably already have most of these, but perhaps not in the precise format we are used to seeing. So rather than initially require you to program custom reports for us, we will ask you for samples of existing ones. If existing reports give us the same information just in a different format, we will try to use those. In order to investigate the suitability of existing reports, we would like to see the following ones as they currently exist on your system, as well as the additional information listed below:

1. Describe statistics kept by agency on daily collector activity. We would like to see examples of all relevant existing reports.

2. Please provide flow charts for the collection process, account boarding, and skip tracing practices (including use of outside services).

3. Batch track reports used by management personnel.

4. Deposit summary reports utilized by the payment-processing department.

5. Acknowledgement reports for placements.

6. Examples of statements produced for client.

7. Status and Information Update file (a.k.a. EXT).

8. PIF/SIF Log

6

**Transfer Process**

*Market Share*

While Sherman reserves the right to make unilateral decisions regarding market share up to and including pulling any and all placements at any time within the limits prescribed in our contract, in general, Sherman will employ a market share strategy similar to those traditionally used by credit grantors. Based on rolling performance comparisons between agencies working the same paper, subsequent placements will go up or down as a percentage of all paper placed based upon a ranking of the performances of the relevant agencies. We are currently developing a monthly scorecard that will be used in making future market share decisions. Upon completion, this scorecard and an updated agency manual will be distributed.

*Notification*

Each month the Director of Account Outsourcing and Inventory Management for Sherman will deliver the market share results to the agency and deliver estimates for placement volumes. Sherman, being a debt buyer, does experience fluctuations in the placement amounts. We experience one-time offerings, which can increase the flow for that month and, conversely, volumes can drop due to market conditions. We will communicate our best estimates to you and are very sensitive to the issues associated with resource management.

*Delivery of Placement Files*

(see appendix 10)

Placement files are delivered to your IT department via e-mail. The contract addendum for the placement is sent to the operations manager for proper signing and delivery back to Sherman. Once the accounts are loaded an e-mail indicating the number of units placed and dollar amount should be sent by the agency to the Director of Account Outsourcing and Inventory Management. This acknowledgement is used to ensure all parties agree to the placement size.

*Charging Interest*

We require that you **do not** charge interest on the accounts we place with you. Instead, we will provide to you at the time of placement the principal owed, accrued interest and interest effective date. Periodically, we will send you an interest update files with new balances. The file will be in a tab-delimited format with the following information:

| | |
|---|---|
| Acctid | Unique ID assigned by Sherman |
| AcctNumber | |
| CurrBalance | Total principal and interest through IntEffectiveDate |
| IntEffectiveDate | Date Interest is Current Through |

7

PLTS 1038

## Reporting Requirements

### General

Sherman is currently refining its set of data "upload" requirements from its agencies. The data received from the agencies will be used by Sherman to create the relevant reports internally. In addition, Sherman will want several reports from the agencies to aid in identifying any reconciliation issues. With regards to these reports, Sherman will strive to use reports the agency already has in place if they are suitable. If Sherman cannot use these reports, we have set up templates illustrating our preferred formats. The specific reports are listed below.

### Batch Track

Each placement is required to have a batch track report produced each month. The report should be delivered to the following e-mail address: AgencyReports@shermanfinancialgroup.com. This report is due each week on Monday. A brief explanation of the report data elements follows:

| Data Element | Description |
|---|---|
| Paid to Agency | The value in this field represents the amount collected by the agency for the week |
| Paid to Sherman | This amount reflects the direct payments received by the original creditor, Alegis or Sherman. The direct payment files are sent to the agency for processing on a weekly basis. |
| Due Agency | This is the amount of the agency's contingency fee for the week. |
| Due Sherman | This is the net amount remitted to Sherman. |
| MTD Total | Gross dollars collected for the month. |
| MTD Liquidation | This is a running total indicating the liquidation percentage for the month. |
| YTD Total | This is a running total of gross dollars collected placement to date. |
| YTD Liquidation | This is a running total of liquidation percentage placement to date. |

### Batch Track Illustration

(See Appendix 4)

### Recap Reports

Recap reports detail financial transactions for the week. Included in this report is the gross, net, fee and NSF activity. A recap must be produced for each placement as well as a summary recap for all placements. The end result culminates in the wire amount sent to Sherman. The recap is used in reconciling the payment files. We would like this report sent to us as an Excel spreadsheet. The report should be delivered to the following e-mail address: AgencyPayments@shermanfinancialgroup.com each Monday with the payment file.

### Recap Report Illustration

(See appendix 5)

8

PLTS 1039

***Status and Information Update File (a.k.a EXT File)***
(See appendix 9)

This report is due to us weekly. This file is used for the following reasons:

1) To send us status updates on your active inventory.

2) To send us status updates on accounts you are returning (ie. SIF, PIF, DEC, BAN, etc.)

3) To send us information updates (ie. date of death for deceased statused account or address update on account skiptraced successfully).

Please note that we do not need an acknowledgement send to us in the EXT file for accounts we have requested you close. Similarly, when your agency returns account to us with a status that indicates the account is inactive on your system, it will not need to be reported in the next status update file.

Following is a list of status codes and the ancillary fields required for return for use in the EXT file:

| Status | Description | Additional Fields Required |
|---|---|---|
| BAN | Bankruptcy filed | Case Number, Chapter, File Date |
| PIF | Paid in full | N/A |
| SIF | Settled in full | N/A |
| PDC | Postdated check plan | N/A |
| PPA | Payment Plan | N/A |
| DIS | Dispute (no longer being worked) | N/A |
| AEX | All efforts exhausted | N.A |
| PRM | Promise accounts not on a payment plan or PDC in office | N/A |
| SKP | Skip accounts | N/A |
| CDR | Cease and desist | N/A |
| DEC | Deceased | Date of Death |
| FRD | Fraud | N/A |
| ACT | Active collections (this should be all that is left) | Active collections (this should be all that is left) |
| CCC | Consumer Counseled Account | N/A |
| ATT | Debtor Retained Attorney | N/A |
| LEG | Legal Action Taken | N/A |

9

PLTS 1040

*Average Settlement Percentage (a.k.a. SIF/PIF Log)*

The report will be in an excel spreadsheet with two tabs. One tab is for all accounts paid in full and settled in full placement to date. The columns will include debtor name, placement balance plus any interest accrued, amount paid, percentage of balance paid. The other tab is the same information only month to date. We will use the average of all PIF and SIF accounts in determining whether we will mandate Sherman approvals for settlements. You must stay above your blanket settlement using this average. This enables the agency to make decisions for below blanket settlements but gives Sherman a tool to manage this process. The report should be delivered to the following e-mail address: AgencyReports@shermanfinancialgroup.com at the end of each month.

*Collector Activity Reports*

TBD based on what you currently have available.

*Fees*

A market rate, to be decided based on the age and type of the paper being placed.

### Work Standards

All accounts must be activated with the first dun letter sent within two days of receiving the Sherman export file. Furthermore, the accounts should indicate collector activity per the stated guidelines in the Work Standards Grid (See Appendix 7). All accounts should indicate attempts have been made in the morning, afternoon and weekends. Sherman expects to see supervisory audits performed. Payment arrangements are not to extend beyond 90 days without prior approval by Sherman. Any arrangement that is broken must have attempts to resolve performed on the day the broken promise occurred. Sherman requires full and complete documentation before it can be closed and returned. Maximum queue sizes are a function of the paper type being worked, average balance and the age since charge off. To that end, our standards, not to be exceeded without prior approval are:

| Paper Type | Primary | Secondary | Tertiary |
|------------|---------|-----------|----------|
| Bankcard | 250 | 350 | 550 |
| Retail | 300 | 400 | 600 |

*Work Standards Grid*

(See Appendix 7)

*First Collections Letter*

Sherman requires adherence to all FDCPA provisions including the first collection letter notifying the debtor Sherman Acquisition LLC is their new creditor. For most placements, Sherman Acquisition must be used in the field titled Current Creditor; additionally you may use the previous creditor name such as FUSA, Household etc. in the Previous Creditor field. For dismissed bankruptcy placements, the creditor will generally be Resurgent Acquisition rather than Sherman Acquisition. The specific creditor name will be noted for each placement on the respective addendum. Please refer to Appendix 6 for an example of this letter.

10

**Close & Return of Accounts**

*General*

Sherman requires electronic files containing all close and returns to be submitted weekly via the EXT file. The following conditions will result in an immediate close and return of the account to Sherman:

1. Consumer Credit Counseled Accounts

2. Deceased

3. Bankrupt

4. Dispute

5. Cease and Desist

6. Paid Prior

7. Fraud

When any of these above circumstances exist, the account must be coded and closed properly to begin the return process.

Any correspondence received must be reflected in the account status on a daily basis, and the account must similarly be segregated for return to Alegis weekly. The actual transfer of close and returns will occur weekly electronically through the EXT file.

Accounts received from agencies via the EXT file are also reviewed on an individual basis to ensure that adequate information has been provided for proper close and return. In some instances, additional information other than simply the new status code will be required. The format for communicating the status change and additional information is presented in Appendix 9.

*Consumer Credit Counseling Accounts*

Accounts under debt management plans ("DMP's") negotiated through a credit counseling firm must be properly documented and closed immediately upon receipt of any notice in writing or verbally by the debtor. Any written notice, agreement, or proposal from a credit-counseling agency should be forward to Alegis-Greenville upon receipt. If the debtor informs the collector a credit counseling agency is involved, the collector should properly update the account, including the company name, contact person, and phone number of the credit-counseling agency. This information should be communicated to Sherman via the EXT file.

*Deceased Accounts*

All deceased accounts should be properly verified, and a copy of the death certificate forward to Alegis-Greenville upon receipt. The accounts should be properly documented with the date of death. All verified deceased accounts should be coded, and returned to Sherman via the EXT file. (If there were a secondary cardholder on the account, that person is still responsible for the debt unless there are other circumstances involved, such as that person is also deceased, in which case we would require verification of both deaths.)

11

PLTS 1042

**Bankrupt Accounts**

Bankruptcy accounts should be verified and include full and complete documentation. Any copy of a bankruptcy notice should be forwarded to Alegis-Greenville upon receipt, with a frequency of no less than once per week. The accounts should be updated with complete attorney information, including attorney's phone number, bankruptcy chapter, and case number, file date, file county and state. These accounts should be coded as bankrupt and Sherman via the EXT file.

**Disputes**

All valid dispute accounts should be properly documented and coded as such. Agencies are required to retain all original correspondence on file for a period no less than 3 years. Copies of correspondence should be forwarded to Alegis-Greenville following the proper procedures outlined by Sherman for that original creditor (the procedures will be provided to you) Alegis-Greenville will retrieve the records (if available) from the original creditor, and send the documentation to the agency.

**Cease and Desist**

All Cease & Desist accounts should be documented, closed immediately and reported via the EXT file. All written documentation should be sent to Alegis-Greenville.

**Paid Prior / Fraud Accounts**

When a debtor claims the account is paid or fraudulent the agency is expected to obtain from the debtor all documentation supporting their position. Forward the documentation to Alegis-Greenville for research.

**Recalls**

Sherman Acquisition LLC will recall accounts for placement at another agency via an electronic file called RCX. The RCX file will be tab-delimited and will contain the following:

| | |
|---|---|
| FileType | "RCX" |
| AcctID | Unique ID assigned by Sherman |
| AcctNumber | Customer Account Number |
| DebtorNo | N/A |
| Fname | |
| Lname | |
| SSN | |
| AcctStatusID | Status at time of recall; see values below |

The following are translations for the account status at the time of recall:

12

| | |
|---|---|
| 1 | Unknown |
| 10 | Collections |
| 20 | Potential Bankruptcy |
| 30 | Legal |
| 40 | Putback |
| 60 | Closed |
| 70 | Warehouse |
| 80 | CCA |
| 90 | PPA |
| 100 | Sold |
| 110 | Paying |
| 120 | Dispute |
| 130 | Deceased |
| 140 | Fraud |
| 150 | Suspense |
| 160 | Settled |
| 170 | Confirmed Bankruptcy |
| 180 | Pending Paying |

Any inquires on accounts recalled from the agency must be directed to the inbound call group at Alegis. The phone number for this group to be provided to the debtor is **800-978-2297**.

**Media Requests**

Requests for applications, payment histories, and other media may be requested through Alegis-Greenville. Alegis-Greenville will provide you with procedures upon placement. Procedures do vary greatly depending on the requirement of the seller from whom Sherman purchased the accounts, and should be properly communicated to your staff. Turnaround time may take up to 3 weeks or longer, depending on information provided by agency, age of accounts, or other mitigating factors. Please use discretion when requesting any media.

**Financial Management**

*Remittance File*

(See Appendix 8)

The file layout is a tab-delimited file using a file name, which contains the agency name, and the date created. It contains each account where a financial transaction has been made since the last remittance.

**Remittance Schedule**

13

PLTS 1044

# EXHIBIT 6

Westlaw.

2006 WL 171920
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

# H

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
Jason Ray REYNOLDS; Matthew Rausch, Plaintiffs-
Appellants,
v.
HARTFORD FINANCIAL SERVICES GROUP,
INC.; Hartford Fire Insurance Company,
Defendants-Appellees.
Ajene Edo, Plaintiff-Appellant,
v.
Geico Casualty Company, Defendant,
and
Geico General Insurance Company; Geico Indemnity
Company; Government Employees
Insurance Company, Subsidiaries of Geico
corporation, Defendants-Appellees.
**Nos. 03-35695, 04-35279.**

Argued and Submitted March 8, 2005.
Filed Jan. 25, 2006.

**Background:** Consumers brought class actions
against insurers in connection with automobile or
homeowners policies, alleging violation of Fair
Credit Reporting Act (FCRA) via failure to transmit
adverse action notices reflecting negative credit
reports. The United States District Court for the
District of Oregon, 2003 WL 22722061, Anna J.
Brown, J., granted summary judgment for insurers in
both actions, 2003 WL 22722061, and consumers
appealed. Appeals were consolidated.

**Holdings:** After withdrawing its prior opinion at
416 F.3d 1097, the Court of Appeals, Reinhardt,
Circuit Judge, held that:

(1) as a matter of first impression, FCRA's adverse
action notice requirement for insurers applies to rate
first charged in initial policies of insurance,
abrogating *Mark v. Valley Insurance Co.*, 275
F.Supp.2d 1307;

(2) adverse action notice requirement applies
whenever consumer would have received lower rate
for insurance had his credit information been more
favorable;

(3) adverse action notice requirement applies
whenever credit report in question is missing or

insufficient for calculation of credit rating;

(4) notice that did not disclose that rates had been
increased because of information in credit report was
inadequate;

(5) potential liability as to family of insurance
companies was not limited to policy issuer,
abrogating *Ashby v. Farmers Group, Inc.*, 261
F.Supp.2d 1213, and *Razilov v. Nationwide Mut. Ins.
Co.*, 242 F.Supp.2d 977; and

(6) "willful" noncompliance, under Act's punitive
damages provision, includes reckless disregard.
Reversed and remanded.

Opinion, 426 F.3d 1020, withdrawn and superseded.

## [1] Credit Reporting Agencies ⌐ 1

108Ak1 Most Cited Cases
Fair Credit Reporting Act's (FCRA) adverse action
notice requirement for insurers, mandating notice in
event of rate "increase" that is based on credit
information insurer obtains, applies to rate first
charged in initial policies of insurance, not just to
rates charged in policy renewals or extensions; Act
requires that insurer issue notice whenever higher
rate is charged than would otherwise apply, even if
insurer has not previously charged consumer at lower
rate; abrogating *Mark v. Valley Insurance Co.*, 275
F.Supp.2d 1307. Fair Credit Reporting Act, § §
603(k)(1)(B)(i), 615(a), 15 U.S.C.A. § §
1681a(k)(1)(B)(i), 1681m(a).

## [2] Credit Reporting Agencies ⌐ 1

108Ak1 Most Cited Cases
Fair Credit Reporting Act's (FCRA) adverse action
notice requirement for insurers, mandating notice in
event of rate "increase" that is based on credit
information insurer obtains, applies whenever
consumer would have received lower rate for
insurance had his credit information been more
favorable, not just when his credit rating is below
average. Fair Credit Reporting Act, § §
603(k)(1)(B)(i), 615(a), 15 U.S.C.A. § §
1681a(k)(1)(B)(i), 1681m(a).

## [3] Credit Reporting Agencies ⌐ 1

108Ak1 Most Cited Cases
Fair Credit Reporting Act's (FCRA) adverse action
notice requirement for insurers, mandating notice in
event of rate "increase" that is based on credit
information insurer obtains, applies whenever credit

report in question is missing or insufficient for calculation of credit rating, and consumer might have received lower rate for insurance had his credit history been complete. Fair Credit Reporting Act, § § 603(d)(1), (k)(1)(B)(i), 615(a), 15 U.S.C.A. § § 1681a(d)(1), (k)(1)(B)(i), 1681m(a).

**[4] Credit Reporting Agencies** 🔑1
108Ak1 Most Cited Cases
Communication from credit reporting agency to insurer that consumer has no information available or insufficient credit history to permit calculation of credit rating qualifies as "consumer report" within meaning of Fair Credit Reporting Act (FCRA). Fair Credit Reporting Act, § 603(d)(1), 15 U.S.C.A. § 1681a(d)(1).

**[5] Credit Reporting Agencies** 🔑1
108Ak1 Most Cited Cases
Under Fair Credit Reporting Act's (FCRA) adverse action notice requirement, required notice must, at minimum, communicate to consumer that adverse action based on consumer report was taken, describe action, specify effect of action upon consumer, and identify party or parties taking action. Fair Credit Reporting Act, § 603(d)(1), 15 U.S.C.A. § 1681a(d)(1).

**[6] Credit Reporting Agencies** 🔑1
108Ak1 Most Cited Cases
Insurer's notice to consumer of adverse rate action based on credit information was inadequate under Fair Credit Reporting Act (FCRA), where notice simply stated that "[insurer's] eligibility and pricing decisions are based in part on consumer report(s) from a consumer reporting agency" and that consumer could make written request to find out more; consumer was entitled to be told that his rates had been increased because of information in his credit report, who had made pricing decision, and names of insurer's affiliated companies that had issued policies with higher rates. Fair Credit Reporting Act, § § 603(k)(1)(B)(i), 615(a), 15 U.S.C.A. § § 1681a(k)(1)(B)(i), 1681m(a).

**[7] Credit Reporting Agencies** 🔑1
108Ak1 Most Cited Cases
Where consumer had applied for insurance with family of companies and was being charged higher rate because of his credit report but allegedly never had received adequate adverse action notice as required by Fair Credit Reporting Act (FCRA), potential liability for FCRA violation was not limited to issuing company, but was joint and several among

all companies that had taken "adverse action," including company that made rate decision, and company that refused to issue policy at lower rate; abrogating *Ashby v. Farmers Group, Inc.,* 261 F.Supp.2d 1213, and *Razilov v. Nationwide Mut. Ins. Co.,* 242 F.Supp.2d 977. Fair Credit Reporting Act, § 603(k)(1)(B)(i), 615(a), 15 U.S.C.A. § § 1681a(k)(1)(B)(i), 1681m(a).

**[8] Credit Reporting Agencies** 🔑1
108Ak1 Most Cited Cases
"Adverse action," within meaning of Fair Credit Reporting Act's (FCRA) adverse action notice requirement for insurers, includes denials and cancellations, and other unfavorable changes, and is not limited to increases in rates. Fair Credit Reporting Act, § § 603(k)(1)(B)(i), 615(a), 15 U.S.C.A. § § 1681a(k)(1)(B)(i), 1681m(a).

**[9] Credit Reporting Agencies** 🔑4
108Ak4 Most Cited Cases
Under Fair Credit Reporting Act's (FCRA) punitive damages provision, "willful" noncompliance requires that act in question was performed knowingly and intentionally, not negligently; however, act need not be product of malice or evil motive. Fair Credit Reporting Act, § 616(a), 15 U.S.C.A. § 1681n(a).

**[10] Credit Reporting Agencies** 🔑4
108Ak4 Most Cited Cases
Under Fair Credit Reporting Act's (FCRA) punitive damages provision, "willful" noncompliance can be shown either by proof of knowing contravention of consumer rights under Act, or by proof of reckless disregard of whether policy or action in question contravened those rights. Fair Credit Reporting Act, § 616(a), 15 U.S.C.A. § 1681n(a).

**[11] Credit Reporting Agencies** 🔑4
108Ak4 Most Cited Cases
Under Fair Credit Reporting Act's (FCRA) punitive damages provision, neither a deliberate failure to determine the extent of its obligations nor reliance on creative lawyering that provides indefensible answers will ordinarily be sufficient to avoid a conclusion that a company acted with willful disregard of FCRA's requirements; reliance on such implausible interpretations may constitute reckless disregard for the law and therefore amount to a willful violation of the law. Fair Credit Reporting Act, § 616(a), 15 U.S.C.A. § 1681n(a).

**[12] Credit Reporting Agencies** 🔑4
108Ak4 Most Cited Cases

2006 WL 171920
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
**(Cite as: 2006 WL 171920 (9th Cir.(Or.)))**

Page 3

Where at least some of the interpretations of the Fair Credit Reporting Act (FCRA) are implausible, consultation with attorneys may provide evidence of lack of willfulness for purposes of FCRA's punitive damages provision, but is not dispositive. Fair Credit Reporting Act, § 616(a), 15 U.S.C.A. § 1681n(a).

## [13] Credit Reporting Agencies ☞4
108Ak4 Most Cited Cases

Whether or not there is willful disregard of Fair Credit Reporting Act's (FCRA) requirements for purposes of FCRA's punitive damages provision in a particular case may depend in part on the obviousness or unreasonableness of the erroneous interpretation; in some cases, it may also depend in part on the specific evidence as to how the company's decision was reached, including the testimony of the company's executives and counsel. Fair Credit Reporting Act, § 616(a), 15 U.S.C.A. § 1681n(a).

Steve D. Larson and Scott A. Shorr, Stoll Stoll Berne Lokting & Shlachter PC, Portland, OR, for appellants Edo, Rausch, and Reynolds.

Robert D. Allen and Meloney Cargil Perry, Baker & McKenzie, Dallas, TX; Christopher Van Gundy, Baker & McKenzie, San Francisco, CA; Thomas Gordon, Gordon & Polscer, LLC, Portland, OR, for appellees GEICO Casualty Company, GEICO General Insurance Company, GEICO Indemnity Company, and Government Employees Insurance Company.

Lisa E. Lear, Douglas G. Houser, Loren D. Podwill, and Andrew Grade, Bullivant Houser Bailey PC, Portland, OR, for appellees Hartford Financial Services Group, Inc., and Hartford Fire Insurance Company.

William E. Kovacic, General Counsel, John F. Daly, Deputy General Counsel for Litigation, and Lawrence DeMille-Wagman, on behalf of the Federal Trade Commission as amicus curiae in support of appellants Edo, Rausch, and Reynolds.

Gilbert T. Schwartz and Heidi S. Wicker, Schwartz & Ballen LLP, on behalf of The American Insurance Association, The Property Casualty Insurers Association of America, The National Association of Professional Insurance Agents, and The National Association of Mutual Insurance Companies, as amicus curiae in support of appellees, Hartford Financial Services Group, Inc., and Hartford Fire Insurance Company.

Appeal from the United States District Court for the

District of Oregon; Anna J. Brown, District Judge, Presiding. D.C. No. CV-01-01529-AJB, D.C. No. CV-02-00678-AJB.

Before: STEPHEN REINHARDT, MARSHA S. BERZON, and JAY S. BYBEE, Circuit Judges.

### ORDER AND OPINION

REINHARDT, Circuit Judge:

## ORDER

**\*1** The opinion and dissent filed on October 3, 2005, amended on October 24, 2005, slip op. 14451, and appearing at 426 F.3d 1020 (9th Cir.2005), is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit. The clerk shall file the attached opinion in its place.

## OPINION

Under the Fair Credit Reporting Act ("FCRA"), insurance companies are required to send adverse action notices to consumers whenever they increase the rates for insurance on the basis of information contained in consumer credit reports. 15 U.S.C. § § 1681a(k)(1)(B)(i), 1681m(a). [FN1] The principal question before us is straightforward: Does FCRA's adverse action notice requirement apply to the rate first charged in an initial policy of insurance? We hold that the answer is yes: The Act requires that an insurance company send the consumer an adverse action notice whenever a higher rate is charged because of credit information it obtains, regardless of whether the rate is contained in an initial policy or an extension or renewal of a policy and regardless of whether the company has previously charged the consumer a lower rate.

We also resolve five ancillary questions. First, we hold that FCRA's adverse action notice requirement applies whenever a consumer would have received a lower rate for insurance had his credit information been more favorable, regardless of whether his credit rating is above or below average. Specifically, the requirement covers those whose credit information is disregarded and replaced for purposes of a rate computation by an average or neutral credit figure, so long as the insurance rates would have been lower had the credit information been more favorable. Second, we hold that charging more for insurance on the basis of a transmission stating that no credit information or insufficient credit information is available constitutes an adverse action based on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case: 1:05-cv-00138 Document #: 73 Filed: 02/03/06 Page 50 of 62 PageID #:921

2006 WL 171920
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

Page 4

information in a consumer report and therefore requires the giving of notice under FCRA. Third, we hold that, to comply with FCRA's notice requirement, a company must, *inter alia,* communicate to the consumer that an adverse action based on a consumer report was taken, describe the action, specify the effect of the action upon the consumer, and identify the party or parties taking the action. Fourth, we hold that when a consumer applies for insurance with a family of companies and is charged a higher rate for insurance because of his credit report, two or more companies within that family may be jointly and severally liable. The notice requirement applies to any company that makes a decision that a higher rate shall be imposed, issues a policy at a higher rate, or refuses to provide a policy at a lower rate, if the company's action is based in whole or in part on the consumer's credit information. [FN2] Finally, we adopt the Third Circuit's definition of "willfully," as that term is employed in FCRA, and hold that a company is liable for a willful violation of FCRA if it "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 226 (3d Cir.1997) (quoting *Philbin v. Trans Union Corp.,* 101 F.3d 957, 970 (3d Cir.1996) (as amended)). Like the Third Circuit, we hold that conscious disregard means "either knowing that policy to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy contravened those rights." *Id.* at 227.

**I. THE ACT AND THE APPEALS**

*2 The Fair Credit Reporting Act seeks to ensure the "[a]ccuracy and fairness of credit reporting" through a variety of means. 15 U.S.C. § 1681. Central to this goal, FCRA limits the persons who may obtain consumer credit reports and requires users of such reports to notify consumers when, in reliance on a consumer report, "adverse action" has been taken. 15 U.S.C. § § 1681a, 1681b, 1681m. Specifically, § 1681m(a) provides: "If a person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report," the person shall provide "notice of the adverse action to the consumer." Adverse action notices advise consumers that an adverse action has been taken against them, and the nature of that action, and alerts them that they may view a copy of the consumer report that triggered the adverse action free of charge and correct any errors affecting their economic well-being. Even if reports are free from error, adverse action notices give consumers

important information about how improved credit information may benefit them and how they can avoid receiving unfavorable credit ratings in the future.

To resolve the various issues that have arisen regarding FCRA's notice of adverse action requirement in a set of related cases, we have consolidated two appeals for purposes of this opinion: *Reynolds v. Hartford Financial Services Group, Inc.,* No. 03-35695 and *Edo v. GEICO Casualty Co.,* No. 04- 35279. *Reynolds* presents the principal issue: May a rate first charged in an initial policy of insurance constitute an increased rate for purposes of the FCRA adverse action notice requirement? Hartford Fire asserts that a rate cannot qualify as increased unless a lower rate has previously been charged to the customer. *Reynolds* also presents the issues whether a communication stating that no credit information or insufficient credit information is available constitutes a "consumer report" under the statute and whether an adverse action notice that does not tell the consumer that an adverse action has been taken against him, describe that action and its effect upon the consumer, and identify the parties taking the action is sufficient under FCRA. *Edo* presents the issue whether an adverse action occurs whenever a consumer would have received a lower rate if his credit information had been more favorable; or whether an insurance company's practice of providing an adverse action notice only if the consumer's credit information is below average (or "neutral") and that factor results in the imposition of a higher rate than if his credit rating had been average, is consistent with FCRA. Both *Edo* and *Reynolds* also require us to decide which companies are liable under FCRA for the failure to give notice of an increased rate when several affiliated companies are involved in the process of rate-setting and policy issuance. Finally, defendants in both cases seek summary judgment on the alternative ground that their actions were not willful as a matter of law. To address this last contention, we must define the meaning of the term "willfully" as it applies in FCRA.

*A. Reynolds v. Hartford Financial Services Group, Inc.*

*3 Jason Reynolds is the sole remaining named-plaintiff in this class action against Hartford Fire Insurance Company ("Hartford Fire"). [FN3] He seeks statutory and punitive damages, as well as reasonable attorneys fees for the company's violation of FCRA's adverse action notice requirement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Reynolds' claims relate to two insurance policies he obtained, one for automobile and the other for homeowners insurance. On the record before us, Hartford Fire set the rates to be charged for both policies. Hartford Property and Casualty Insurance Company of Hartford ("PCIC Hartford") issued Reynolds the homeowners insurance policy and Hartford Insurance Company of the Midwest ("Hartford Midwest") issued him the automobile insurance policy. We refer to Hartford Fire, Hartford PCIC, and Hartford Midwest as the "Hartford Companies."

Reynolds originally sued Hartford Fire and later sought to amend his complaint to add PCIC Hartford and Hartford Midwest. [FN4] Hartford Fire sought summary judgment, which the district court granted on two grounds. First, it held that "the entity contracting with the policyholder is the only possible statutory taker of adverse action because only the contracting entity is capable of increasing the premium for or changing the terms of the insurance contract with the insured." Second, and in the alternative, it held that an insurance company that issues a policy to a new policy-holder "cannot[be held to] 'increase' a charge for insurance unless the insurer makes an initial demand for payment of the insured and subsequently increases the amount of that demand based on information in the insured's credit report." The second and alternative holding relies on a previous decision by the same court, *Mark v. Valley Insurance Co.*, 275 F.Supp.2d 1307, 1317 (D.Or.2003). On the basis of that earlier decision, the district court also denied Reynolds leave to amend, reasoning that he could not "state viable FCRA claims against the proposed defendants," PCIC Hartford and Hartford Midwest. In other words, leave was denied on the ground that the policies were initial issues and no previous charge had been made to the customer at a lower rate.

*The Hartford Companies' Use of Credit Information*

During the relevant time period, Hartford Fire and the American Association of Retired Persons ("AARP") had an agreement under which Hartford Fire or one of its subsidiaries would issue automobile and homeowners insurance to AARP members at a premium rate if those individuals enjoyed favorable credit ratings. While the procedures used for issuing the two kinds of insurance varied slightly, they were the same in most relevant respects. In both cases, employees of Hartford Fire would make all of the decisions concerning AARP members' insurance policies for all of its subsidiaries, including Hartford

Midwest, which issued automobile insurance, and PCIC Hartford, which issued homeowners insurance. In doing so, Hartford Fire's employees would obtain credit information from Trans Union, a consumer information bureau, through a contract to which Hartford Fire and Trans Union were signatories. This information would be conveyed to Hartford Fire through the risk assessment and data supply firm, ChoicePoint, in the form of an "insurance score." High insurance scores correlated with more favorable credit reports. With regard to automobile insurance, if an AARP member had a high enough insurance score, he would qualify for a ten percent discount. With regard to homeowners insurance, only if the member obtained a top insurance score could he be assigned to the top tier of insurance with the best rate.

*4 If, when Hartford Fire sent a request for an insurance score, no credit information matched the name and address of the consumer or if the information that did match was insufficient to generate an insurance score, this information would be transmitted to the company, and the consumer would be labeled a "no hit" or a "no score" and would not be assigned an insurance score. Without an insurance score, the consumer could not qualify for the ten percent discount with Hartford Midwest, nor could he be placed in the top insurance tier with PCIC Hartford. As a result, a "no hit" or "no score" consumer would in numerous instances pay more for insurance than if he had received a high insurance score. [FN5]

*The Hartford Companies' Adverse Action Policy*

Hartford Fire is the only one of the Hartford Companies to have developed or sent adverse action notices. The parties dispute whether Hartford Fire actually sent an adverse action notice to Reynolds, but that is a question of fact for the factfinder. Whether the notice Hartford Fire contends it sent was adequate under FCRA is a question of law that we discuss below.

*Reynolds' Insurance Policies*

Reynolds applied for both automobile and homeowners insurance by contacting the Hartford Companies. He had no existing policy with that group. An employee of Hartford Fire collected personal information and attempted to obtain Reynold's insurance score twice, once for each insurance application. The credit bureau reported both times that Reynolds was a "no hit." *See* n. 5, *supra.* Although Hartford Midwest issued him an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case: 1:05-cv-00138 Document #: 73 Filed: 02/03/06 Page 52 of 62 PageID #:923

2006 WL 171920                                                                                    Page 6
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

automobile insurance policy and Hartford PCIC issued him a homeowners insurance policy, as a result of his "no hit" status Reynolds did not receive either of the AARP premium rates.

### B. Edo v. GEICO Casualty Co.

The second of the consolidated cases relates to an automobile insurance policy obtained by Ajene Edo. Like Reynolds, Edo seeks statutory and punitive damages, as well as reasonable attorney fees, on behalf of a class of consumers for violation of FCRA's adverse action notice requirement. He, too, is the sole remaining named-plaintiff. Edo appeals the district court's grant of summary judgment to defendants Government Employees Insurance Company ("Government Employees"), General Insurance Company ("GEICO General"), and GEICO Indemnity Corporation ("GEICO Indemnity"). [FN6] These are affiliated companies, all of which are subsidiaries of the GEICO Corporation and are referred to collectively by the parties as the "GEICO Companies." We sometimes refer to that group of companies by that designation and sometimes simply as GEICO.

Unlike Hartford Fire, the GEICO Companies concede that adverse actions can occur with respect to the first rates charged in an initial policy of insurance. They do not assert that in order for an adverse action to occur there must be an increase to a rate that the consumer has previously been charged. Nevertheless, the district court granted summary judgment with respect to the various GEICO entities on a number of different grounds. First, the court held that Edo did not have standing to bring a FCRA claim against Government Employees because he "was not eligible for insurance coverage from [that company] regardless of his consumer credit score because Government Employees offers insurance coverage only to government employees or military personnel." Next, it granted summary judgment in favor of GEICO General because that company "did not contract with Plaintiff to issue or to underwrite an insurance policy." This ruling was in accord with the district court's previous holdings in other related cases that only the company that issues the insurance policy can be held to have taken an adverse action under FCRA. See *Ashby v. Farmers Group, Inc.,* 261 F.Supp.2d 1213, 1222 (D.Or.2003); *Razilov v. Nationwide Mut. Ins. Co.,* 242 F.Supp.2d 977, 989-90 (D.Or.2003). Finally, it granted summary judgment to GEICO Indemnity because "the premium charged to [Edo] by GEICO Indemnity would have been the same even if GEICO Indemnity did not consider

information in Plaintiff's consumer credit history."

### GEICO's Use of Credit Information

*5 The GEICO Companies are organized by risk. GEICO General provides preferred policies with low rates for those who are lesser insurance risks. Government Employees also provides preferred policies, but only to government employees. GEICO Indemnity issues standard policies with mid-level rates for moderate risk consumers. Finally, GEICO Casualty issues non-standard policies with high rates for those who are greater risks. The GEICO Companies began using consumer credit reports in early 1999.

In order to purchase insurance, consumers call a toll-free number and talk to a GEICO sales counselor. The sales counselor is employed by Government Employees but works on behalf of all of the GEICO Companies. Indeed, all of the work of the GEICO Companies is performed by Government Employees workers, as the other companies do not have any employees. Upon learning that a customer wishes to purchase automobile insurance, the sales counselor elicits basic information and asks whether he may use the customer's credit information when arranging for his policy. If the customer acquiesces, the sales counselor obtains the credit information in the form of an insurance score calculated by the data analysis firm Fair Isaacs from information supplied by Trans Union. Government Employees is the only GEICO company that has a contract with Trans Union and Fair Isaacs to provide this information. Using a Government Employees computer system, the sales counselor converts the insurance score to a credit weight and combines it with other weights assigned to other insurance factors, such as age and number of accidents to arrive at a final total insurance weight. Based on that final weight, the sales counselor assigns the customer to one of the GEICO Companies and determines the appropriate insurance tier. This determination serves to establish the rate the consumer will be charged. After the information the customer has provided has been verified, he is issued an insurance policy at that rate.

### GEICO's Adverse Action Policy

The GEICO Companies' original FCRA policy, adopted in 1999, was to send adverse action notices to all consumers whose credit reports were used in making insurance decisions. Later that same year, GEICO changed its policy, at least in part to reduce costs. Instead of sending adverse action notices to

everyone, GEICO developed a system for determining which actions it deemed adverse by comparing the rate charged to the rate that it would have charged had the credit information been "neutral."

GEICO's new system, however, did not comply with FCRA's requirements. The GEICO Companies' policy during the period relevant to this case was to compare the consumer's actual company and tier placement (which, as described above, was based in part on his credit rating) with the company and tier to which he would have been assigned had a "neutral" credit weight been substituted for his actual credit weight when calculating the final total insurance weight. The GEICO Companies' "neutral" credit weight was defined, generally speaking, as the weight that reflected the average credit rating of all consumers. The GEICO Companies would calculate two final total insurance weights, using only one variable--the actual credit weight in one case, and the "neutral" credit weight in the other. Only if the final total insurance weight using the "neutral" credit weight would have resulted in the consumer's placement with a different company or in a different tier than that to which the consumer was actually assigned, and only if such different placement would have resulted in the consumer's being charged a lower rate, would GEICO Companies issue an adverse action notice. In other words, the GEICO Companies' policy was to refrain from sending a statutory notice if use of the consumer's actual credit information caused the applicant to be placed with an entity and in a tier that resulted in the charging of the same or a lower rate than the rate that he would have been charged had the calculation and the ensuing assignment been based on a "neutral" or average credit rating. Under this policy, even if the rate ultimately charged was higher than the rate to which the consumer would have been entitled had he had a more favorable credit rating, the statutory notice was not sent if use of the "neutral" and the actual credit data would have led to an assignment to the same entity and tier. Thus, it was *not* GEICO's policy to send adverse action notices to all consumers who would have been charged lower rates had they enjoyed a more favorable credit rating.

### Edo's Insurance Application

\*6 Following Edo's call to GEICO's toll-free number, the sales counselor used the credit information he obtained to place its new customer with GEICO Indemnity. The GEICO Companies then applied its policy for determining whether an adverse

action had occurred. GEICO calculated that, had the neutral credit weight been used instead of Edo's actual credit weight, the resulting final total weight would still have resulted in Edo's being placed with GEICO Indemnity. That Edo's placement, and the rate charged for his insurance, did not improve when the "neutral" weight was used is not surprising, as Edo's actual credit weight was better than average. Under its policy, however, the GEICO Companies did not issue him an adverse action notice.

It is uncontested that if the GEICO Companies had used the highest credit weight that a consumer could receive rather than the neutral credit rate to determine Edo's alternate placement, GEICO would have placed Edo with GEICO General, a preferred company, and offered him a lower insurance rate. In short, if Edo's credit information had been more favorable (even though it was already above average), he would have been charged less for his insurance. In 2002, the GEICO Companies changed its policy and began to issue adverse action notices whenever a report with more favorable credit information would have resulted in a lower insurance rate. Under the new policy, Edo would have received the statutory notice.

## II. ANALYSIS

### A. Initial Policies of Insurance

[1] The principal question in this and a number of related cases [FN7] constitutes a matter of first impression: Does FCRA's adverse action notice requirement apply to the rates first charged in an initial policy of insurance or is it limited to an increase in a rate that the consumer has previously been charged? As with all statutory interpretation, we begin with the text of the statute. *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). An adverse action with respect to insurance is defined by 15 U.S.C. § 1681a(k)(1)(B)(i) as "a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance."

Specifically, we must decide whether charging a higher price for initial insurance than the insured would otherwise have been charged because of information in a consumer credit report constitutes an "increase in any charge" within the meaning of FCRA. First, we examine the definitions of "increase" and "charge." Hartford Fire contends that,

2006 WL 171920
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

Page 8

limited to their ordinary definitions, these words apply only when a consumer has previously been charged for insurance and that charge has thereafter been increased by the insurer. The phrase, "has previously been charged," as used by Hartford, refers not only to a rate that the consumer has previously paid for insurance but also to a rate that the consumer has previously been quoted, even if that rate was increased before the consumer made any payment. Reynolds disagrees, asserting that, under the ordinary definition of the term, an increase in a charge also occurs whenever an insurer charges a higher rate than it would otherwise have charged because of any factor--such as adverse credit information, age, or driving record [FN8]--regardless of whether the customer was previously charged some other rate. According to Reynolds, he was charged an increased rate because of his credit rating when he was compelled to pay a rate higher than the premium rate because he failed to obtain a high insurance score. Thus, he argues, the definitions of "increase" and "charge" encompass the insurance companies' practice. Reynolds is correct.

*7 "Increase" means to make something greater. *See, e.g.,* OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("The action, process, or fact of becoming or making greater; augmentation, growth, enlargement, extension."); WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN E NGLISH (3d college ed.1988) (defining "increase" as "growth, enlargement, etc[.]"). "Charge" means the price demanded for goods or services. *See, e.g.,* OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("The price required or demanded for service rendered, or (less usually) for goods supplied."); WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH (3d college ed. 1988) ("[T]he cost or price of an article, service, etc."). Nothing in the definition of these words implies that the term "increase in any charge for" should be limited to cases in which a company raises the rate that an individual has previously been charged.

While no court has considered whether an increase requires a previous charge within the meaning of FCRA, the Sixth Circuit has employed the term "increase" in an analogous circumstance, stating, "An increase in the base price of an automobile that is not charged to a cash customer, but is charged to a credit customer, *solely because he is a credit customer,* triggers [the Truth in Lending Act's] disclosure requirements." *Cornist v. B.J.T. Auto Sales, Inc.,* 272 F.3d 322, 327 (6th Cir.2001). Defined in this manner, an increased charge is a charge that is higher than it

would otherwise have been but for the existence of some factor that causes the insurer to charge a higher price.

Second, the statutory definition of "adverse action," as it is made applicable to insurance, explicitly encompasses "*any* insurance, existing or applied for." 15 U.S.C. § 1681a(k)(1)(B)(i) (emphasis added). Congress' use of the latter phrase demonstrates its intent that "adverse actions" apply to all insurance transactions--from an initial policy of insurance to a renewal of a long-held policy. The text of the statute does not permit the imposition of any temporal limitation. Hartford has suggested no sensible alternative reading of "existing or applied for." Thus, reading the terms "increase" and "charge" in the context of the provision as a whole, particularly the "existing or applied for" phrase, supports affording them their ordinary meaning.

Third, our interpretation of the terms at issue best comports with the stated purpose of FCRA: to ensure the "[a]ccuracy and fairness of credit reporting." 15 U.S.C. § 1681. FCRA's adverse action notice requirement is an important tool that Congress created, using broad, encompassing language. Through this requirement, Congress sought to promote the rights of consumers by giving them essential information about how their credit report is used, information that they could obtain in no other way. The information Congress mandated serves two important ends. First and foremost, once consumers possess this information they can check and correct any errors in their credit reports. This increases the chances that a consumer's financial stability will not be hampered by faulty credit information. It also improves the overall accuracy of credit reports, which facilitates the operation of our markets. Second, even when credit reports are accurate, informing consumers when their credit rating is hurting them in the marketplace gives them important information about the benefits of improving their credit rating in the future and may even assist them in learning how to do so.

*8 Hartford Fire's contention that FCRA does not apply to the rate charged in initial insurance policies would seriously undermine Congress's clear purpose. The use of credit reports to help determine the rates to be charged for initial insurance policies is common. Moreover it is these policies that the economically unsophisticated are most likely to purchase. Congress did not create such strong protections for consumers only to render them inapplicable in so critical a circumstance.

2006 WL 171920
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

Page 9

Furthermore, as FCRA is a consumer protection statute, we must construe it so as to further its objectives. *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995). While our interpretation is the plain one, this canon supports our result.

We hold that whenever because of his credit information a company charges a consumer a higher initial rate than it would otherwise have charged, it has increased the charge within the meaning of FCRA. Therefore, the fact that Reynolds' policy was an initial one, and his rate was the initial rate charged, is of no consequence. Reynolds' rate was increased above that which it would have otherwise been because of his credit report. As the statute's text is clear, we need not resort to either the agency's interpretations [FN9] or the statute's legislative history. The district court erred in granting summary judgment to Hartford Fire on the ground that FCRA does not apply to the rate first charged in an initial policy. [FN10]

### B. What Constitutes An Adverse Action

[2] The GEICO Companies contend that their method of determining which consumers were entitled to receive adverse action notices comported with FCRA, while Edo asserts that under GEICO's procedure numerous consumers who were charged increased rates because of their credit rating failed to receive the statutorily required notice. At the time Edo sought an initial insurance policy, it was GEICO's practice to send an adverse action notice to a consumer only if the use of his actual credit information resulted in his placement with an entity and tier that provided a higher insurance rate than the entity and tier to which he would have been assigned if "neutral" or average credit information had been used instead. In short, it was GEICO's policy to send adverse action notices only to some of the consumers who would have received more favorable rates had they enjoyed a better credit rating. Specifically, notices were sent only to those with below-average credit who would have been charged a lower rate for insurance had they received an average credit rating. GEICO contends that only in such circumstance has an adverse action occurred. GEICO is incorrect.

FCRA does not limit its adverse action notice requirement to actions that result in the customer paying a higher rate than he would otherwise be charged because his credit rating is worse than the average consumer's. Instead, it requires such notices whenever a consumer pays a higher rate because his credit rating is less than the top potential score. In other words, if the consumer would have received a lower rate for his insurance had the information in his consumer report been more favorable, an adverse action has been taken against him. [FN11] Such is the case with Edo. Because Edo would have been placed with GEICO General instead of GEICO Indemnity and thus would have been charged a lower rate if his credit rating had been higher, an adverse action occurred and an adverse action notice was required under FCRA. [FN12] Under the GEICO formula, the fact that the credit rating Edo actually received was higher than the average rating did not mean that Edo would not be charged a higher rate than he would have been charged had he had an even better credit report, but it ensured that he would not receive an adverse action notice when he was charged that increased rate. The district court erred in granting GEICO Indemnity summary judgment on the ground that Edo's rate was not increased on the basis of his credit report.

### C. "No Hit" Adverse Actions

\*9 [3] Hartford Fire makes a separate argument as to why in Reynolds' case no adverse action was taken. Specifically, the company argues that no adverse action was taken against Reynolds "based in whole or in part on any information contained in a consumer report" within the meaning of 15 U.S.C. § 1681m(a). When Hartford Fire requested credit information about Reynolds, Trans Union did not possess the necessary information to generate an insurance score and transmitted this finding to the insurer. Reynolds was therefore considered a "no hit." *See* n. 5, *supra.* Because he was so designated, Reynolds was rendered ineligible for the premium rates available to AARP members with qualifying credit ratings, and, as a result, was charged a higher rate in his initial policies. Hartford Fire argues, however, that these were not adverse actions because, it contends, an "adverse action" occurs only if it is based on "information contained in a consumer report" and no such report was received with respect to Reynolds. We reject Hartford Fire's argument.

[4] FCRA's definition of "consumer report" is broad. It unquestionably encompasses a credit reporting agency's communication to an insurance company that a consumer does not have enough information on file for an insurance score to be calculated. Specifically, 15 U.S.C. § 1681a(d)(1) explains that "[t]he term 'consumer report' means any written, oral, or other communication of *any information* by a consumer reporting agency bearing on a consumer's

Case: 1:05-cv-00138 Document #: 73 Filed: 02/03/06 Page 56 of 62 PageID #:927

2006 WL 171920                                                                                                    Page 10
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

credit worthiness, credit standing, [or] credit capacity ...." (emphasis added). Reporting that an agency cannot obtain any information regarding a consumer or that a consumer has insufficient credit information on file conveys a message regarding the consumer's creditworthiness, standing, and capacity that makes his obtaining of credit far more difficult. Such a report suggests that the consumer cannot show that he pays debts in a timely manner. That information may be false: The credit agency may have used the wrong name or searched the wrong records, missing data that would have shown that the applicant is indeed creditworthy. Providing notice therefore serves the statutory purpose of allowing the consumer to correct errors in credit reports. Accordingly, we hold that a communication that a consumer has no information available or an insufficient credit history to permit the calculation of a credit rating qualifies as "a consumer report" within the meaning of FCRA. Because it is uncontested that Reynolds would have been charged lower insurance rates had he received qualifying credit ratings and because the application of the "no hit" rule precluded him from receiving such ratings, we hold that an adverse action was taken against him on the basis of information contained in a credit report. Accordingly, the district court's order of summary judgment may not be affirmed on the ground that its actions with respect to Reynolds were not based on such information.

### D. Adequacy Of The Notice

**\*10 [5]** *Hartford Fire also urges us to affirm the district court's* grant of summary judgment on the alternative ground that, although (in its view) it was not required under FCRA to send adverse action notices, the notices that the Hartford Companies did send were sufficient to meet its FCRA responsibilities. We reject this argument because the notices were inadequate as a matter of law. Under 15 U.S.C. § 1681m(a)(1), a company that takes adverse action on the basis of a consumer report must "provide oral, written, or electronic notice of the adverse action to the consumer" as well as meet a number of other specific requirements. [FN13] While the term "notice of an adverse action" is not defined in the statute, we hold that, at a minimum, such a notice must communicate to the consumer that an adverse action based on a consumer report was taken, describe the action, specify the effect of the action upon the consumer, and identify the party or parties taking the action. [FN14] *See Fischl v. General Motors Acceptance Corp.,* 708 F.2d 143, 150 (5th Cir.1983) (requiring disclosure of "reliance on data contained in[a consumer's] credit report" when

providing notice of an adverse action).

**[6]** The notices Reynolds received did not comply with any of the above requirements. They did not tell him that any adverse action had been taken against him. They simply stated that "[t]he Hartford's eligibility and pricing decisions are based in part on consumer report(s) from a consumer reporting agency" and allowed him to make a written request in order to find out more. Reynolds was entitled to be informed that his rate for insurance was increased because of information in his credit report. He was also entitled to be told that Hartford Fire made the pricing decision and that Hartford PCIC and Hartford Midwest issued him policies at those higher rates. FCRA recognizes the difference between telling a consumer that his credit information *could* affect his insurance rate and that it *did* adversely affect his rate, and requires notice of the latter. We therefore reject Hartford Fire's alternative argument for upholding the district court's order.

### E. Who Is Liable

**[7]** The defendants all contend that only one company can be liable when an insurance policy contains an increase in rates--the issuing company. The plain text of the statute, as well as its purposes, are to the contrary. Here, we hold that all of the defendants are potentially liable under the statute.

FCRA requires that "any person" who takes an adverse action is liable. 15 U.S.C. § 1681m(a). The definition of "any" includes the plural. *See, e.g.,* WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN E NGLISH (3d college ed.1988) ("one, a, an, or some; one or more without specification or identification"). With regard to insurance transactions, liability attaches whenever an adverse action is taken "in connection with the underwriting of insurance." 15 U.S.C. § 1681a(k)(1)(B)(i). This broad "in connection with" language confirms that a variety of entities may be liable. No provision in the statute nor comment in the legislative history suggests that Congress intended that only a single company be responsible under FCRA when a consumer is charged an increased rate for insurance. Therefore, the defendants find themselves in the difficult position of persuading us that Congress intended something different from what it wrote. We analyze their three arguments separately.

**\*11** First, GEICO argues that the words "applied for" in the definition of adverse action, § 1681a(k)(1)(B)(i), demonstrate that only the issuing

company is liable under the statute. On that basis,
GEICO asks us to hold that Edo "applied for"
insurance only with GEICO Indemnity because that
was the company that issued him a policy. The
argument is frivolous, both factually and legally. As a
matter of fact, Edo did not apply to one company but
instead requested insurance from the GEICO family
of companies. He did not specifically ask to be
placed with GEICO Indemnity, and the GEICO
Companies did not interpret his telephone call as
requesting a policy with that company in particular,
as evidenced by the evaluation by Government
Employees of his eligibility for a policy from several
of the GEICO affiliates. That he was placed with
GEICO Indemnity and not another GEICO entity was
the result of a decision made by Government
Employees personnel, not the result of a limited
application by Edo. Thus, GEICO's argument has no
basis in fact. Furthermore, as a matter of law, we
refuse to turn the words "applied for" into a legal
term of art that refers only to the issuing company.
The clearest indication that Congress did not intend
the words "applied for" to be used in such an unusual
manner is that this interpretation would eliminate all
potential FCRA liability for denials of insurance. No
one disputes that FCRA defines the term adverse
action to include denials. 15 U.S.C. §
1681a(k)(1)(B)(i). However, under GEICO's
interpretation, because a consumer has not "applied
for" insurance unless a policy has been issued and
because a company that denies insurance has not, by
definition, issued a policy, adverse action notices
would never be required for denials of insurance.
This is manifestly contrary to the statute, as it would
eliminate from its coverage an important set of
actions that Congress clearly intended to subject to
FCRA's requirements.

[8] Second, all the defendants argue that "*takes* any
adverse action" limits FCRA's adverse action notice
requirement to companies that actually issue an
insurance policy. We find no such limitation in the
statute by virtue of Congress's use of the word
"takes" or otherwise. 15 U.S.C. § 1681m(a). To the
contrary, adverse action is defined far more broadly
than just "issuance." 15 U.S.C. § 1681a(k). The
statutory definition specifically includes denials and
cancellations as well as increases in rates, and other
unfavorable changes, whenever and by whomever
made. The word "takes" neither adds to nor detracts
from that definition. It describes the act of engaging
in the conduct that gives rise to the notice
requirement. As discussed below, all of the
companies at issue here took "adverse actions," as
that term is defined in the statute.

Third and finally, all the defendants argue that we
should hold liable only the issuing company because
holding several companies liable for FCRA
violations arising out of the issuance or denial of a
single application will result in multiple, confusing
adverse action notices, which would thwart rather
than further FCRA's purpose. Such is not the case.
Joint and several liability simply imposes the
obligation on all of the affiliated companies
responsible for taking an adverse action to ensure that
the affected consumer receives a statutory notice
describing the adverse affect of his credit report
within that family of companies. Multiple notices are
not required; a single notice from the companies
involved identifying those companies and their
respective roles will suffice.

*12 Holding all the companies that take adverse
action against a consumer jointly responsible for
issuing a notice furthers FCRA's objectives. For
example, joint responsibility substantially increases
the prospect that an adverse action notice will be sent
and that a customer who seeks to obtain insurance
from a group of affiliated companies will be
informed as to the manner in which his credit
information adversely affected him. By imposing
joint and several liability, Congress also improved
the quality of information consumers receive,
because each of the companies that takes an adverse
action against the consumer must say so in the notice.

We doubt that many consumers understand how a
group of affiliated insurance companies operates or
how consumers are assigned to specific entities
within their overall structure. By having the
organizations explain the actions each affiliated
company took, Congress made it more likely that
consumers would comprehend what transpired with
respect to the increased cost of their policy.

On the basis of the record before us all three GEICO
Companies and Hartford Fire may be held liable
under FCRA, as may the two other Hartford entities
as to which leave to amend was denied. [FN15] Two
of the GEICO Companies, working together, are
responsible for increasing Edo's charge for insurance:
Government Employees, which made the decision as
to which of the GEICO family of companies would
issue the insurance to Edo and, in so doing,
determined that he would be charged at an increased
rate, and GEICO Indemnity, which then issued the
insurance policy at that increased rate. GEICO
General is responsible because it denied Edo
insurance for the reason that his credit rating was not

Case: 1:05-cv-00138 Document #: 73 Filed: 02/03/06 Page 58 of 62 PageID #:929

2006 WL 171920                                                                                    Page 12
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

sufficiently high. Hartford Fire, like Government Employees, made the critical rate-to-be-charged decision. It determined that, on the basis of Reynolds' credit report, he was not eligible for the lower rates afforded by its affiliates to the qualifying AARP members and that he would be charged for his insurance at a higher rate. Hartford Fire may therefore be held liable for increasing Reynolds' charges for insurance on the basis of his credit rating. Hartford PCIC and Hartford Midwest issued the policies to Reynolds at the increased rates determined by Hartford Fire, and may, accordingly, be held liable as well.

In sum, Government Employees, GEICO General, and GEICO Indemnity may be held jointly and severally liable for failing to issue an adverse action notice to Edo. Likewise, Hartford Fire may be held liable for failing to issue a notice to Reynolds, and Reynolds may also properly state claims against Hartford PCIC and Hartford Midwest. Thus, Reynolds should be permitted to amend his claims on remand.

### F. Meaning Of Willfully

Each of the defendants asks that we affirm the district court's grant of summary judgment on the alternative ground that, as a matter of law, its conduct was not willful. We must first define "willfully" as it appears in FCRA. [FN16] Interestingly, there is no legislative history to explain what Congress intended by the use of that term.

*13 [9] We begin by following all five of the other circuits that have addressed the issue of the mens rea that is required with regard to the *act* that allegedly violates FCRA and hold that the act must have been performed "knowingly and intentionally." *See Phillips v. Grendahl,* 312 F.3d 357, 370 (8th Cir.2002); *Dalton v. Capital Associated Indus., Inc.,* 257 F.3d 409, 418 (4th Cir.2001); *Cousin v. Trans Union Corp.,* 246 F.3d 359, 372 (5th Cir.2001); *Duncan v. Handmaker,* 149 F.3d 424, 429 (6th Cir.1998); *Cushman v. Trans Union Corp.,* 115 F.3d 220, 226 (3d Cir.1997). An act that is merely negligent is not willful. *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) ("The word 'willful' is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent."). Additionally, we adopt the position of four of the five other circuits and hold that, although the act must be intentional, it

need not be the product of "malice or evil motive." *See, e.g., Dalton,* 257 F.3d at 418 (holding that a plaintiff need not show malice or evil motive); *Cousin,* 246 F.3d at 372 (same); *Bakker v. McKinnon,* 152 F.3d 1007, 1013 (8th Cir.1998); *Cushman,* 115 F.3d at 226 (same). *But see Duncan,* 149 F.3d at 429 (requiring " 'a motivation to injure' "). In this respect, for purposes of willfulness we distinguish civil from criminal liability. *See Bryan v. United States,* 524 U.S. 184, 191, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) ("Most obviously [willfulness] differentiates between deliberate and unwitting conduct, but *in the criminal law* it also typically refers to a culpable state of mind." (emphasis added)).

[10] Next, we address the more difficult question: What is the nature of the mens rea that is required with respect to the law? Here, we follow the Third Circuit. Specifically, we hold that as used in FCRA "willfully" entails a "conscious disregard" of the law, which means "either knowing that policy [or action] to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy [or action] contravened those rights." *Cushman,* 115 F.3d at 227. We adopt this holding for two principal reasons.

First, we believe that the Third Circuit's definition best comports with Supreme Court precedent. The Court has consistently stated that willfulness for civil liability requires either knowledge or reckless disregard with respect to whether an action is unlawful. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 128, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *see also Hazen Paper Co. v. Biggins,* 507 U.S. 604, 614, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (quoting *Thurston* and holding that, for an alleged civil violation of the Age Discrimination in Employment Act (ADEA), "willful" requires only a " 'reckless disregard for the matter of whether its conduct was prohibited by the ADEA' "); *McLaughlin,* 486 U.S. at 134 n. 13 (using the *Thurston* definition of "willful" in interpreting the Fair Labor Standards Act); *United States v. Illinois Cent. R.R. Co.,* 303 U.S. 239, 242-43, 58 S.Ct. 533, 82 L.Ed. 773 (1938) (holding civil defendant's failure to unload a cattle car was "willful" because it showed a disregard for governing statute and an indifference to its requirements). The Court's rule with respect to civil cases differs from its rule in criminal proceedings. In criminal cases, actual knowledge of illegality is required for a willful violation of a criminal statute. *See Bryan,* 524 U.S. at 196 (requiring "knowledge that the conduct is unlawful"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case: 1:05-cv-00138 Document #: 73 Filed: 02/03/06 Page 59 of 62 PageID #:930

2006 WL 171920                                                                     Page 13
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

in a criminal case); _Ratzlaf v. United States_, 510 U.S.
135, 149, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)
(requiring proof that the criminal defendant "knew
the structuring [of financial transactions] in which he
engaged was unlawful"); _Cheek v. United States_, 498
U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617
(1991) (requiring proof that a criminal "defendant
knew of the duty purportedly imposed by the
provision of the statute or regulation he is accused of
violating"). [FN17]

**\*14** Second, the Third Circuit's approach best
furthers the purposes and objectives of the Act. It is
fair and balanced; it is practical as well. It avoids the
two extremes of excusing noncompliance even
though the answer to a previously undecided question
is objectively apparent and imposing liability
notwithstanding a truly excusable inability to predict
future developments in the evolving construction of a
statute by the courts. It encourages companies that
use consumer credit reports to make the necessary
effort to inform themselves fully and fairly as to their
statutory obligations and, as a result, to carry out the
statutory mandate of ensuring that consumers are
notified when their credit information has been used
against them. Unlike the defendants' preferred
definition, the Third Circuit's standard does not create
perverse incentives for companies covered by FCRA
to avoid learning the law's dictates by employing
counsel with the deliberate purpose of obtaining
opinions that provide creative but unlikely answers to
"issues of first impression." Because a reckless
failure to comply with FCRA's requirements can
result in punitive damages, insurance and other
companies will more likely seek objective answers
from their counsel as to the true meaning of the
statute.

[11] In sum, if a company knowingly and
intentionally performs an act that violates FCRA,
either knowing that the action violates the rights of
consumers or in reckless disregard of those rights, the
company will be liable under 15 U.S.C. § 1681n for
willfully violating consumers' rights. A company will
not have acted in reckless disregard of a consumers'
rights if it has diligently and in good faith attempted
to fulfill its statutory obligations and to determine the
correct legal meaning of the statute and has thereby
come to a tenable, albeit erroneous, interpretation of
the statute. In contrast, neither a deliberate failure to
determine the extent of its obligations nor reliance on
creative lawyering that provides indefensible answers
will ordinarily be sufficient to avoid a conclusion that
a company acted with willful disregard of FCRA's
requirement. Reliance on such implausible

interpretations may constitute reckless disregard for
the law and therefore amount to a willful violation of
the law.

[12][13] Where, as here, at least some of the
interpretations are implausible, consultation with
attorneys may provide evidence of lack of
willfulness, but is not dispositive. See _Baker v. Delta
Air Lines, Inc._, 6 F.3d 632, 645 (9th Cir.1993);
_Uffelman v. Lone Star Steel Co._, 863 F.2d 404, 409
(5th Cir.1989) (stating that "seeking legal advice
[does not] ipso facto establish[ ] the appropriate
intent [willfulness]"). Whether or not there is willful
disregard in a particular case may depend in part on
the obviousness or unreasonableness of the erroneous
interpretation. In some cases, it may also depend in
part on the specific evidence as to how the company's
decision was reached, including the testimony of the
company's executives and counsel. Because the
parties did not have an adequate opportunity to
explore the issue in the district court, we remand for
further proceedings.

### III. CONCLUSION

**\*15** In conclusion, we hold that FCRA applies, _inter
alia_, to the first rates charged in initial insurance
policies. We also hold that FCRA requires insurance
companies to send adverse action notices whenever
they charge a higher rate for insurance, in initial
policies or otherwise, because of the consumer's
credit information, not simply when the consumer's
credit rating is below average. Furthermore, we hold
that a communication that there is a lack of sufficient
credit information regarding a consumer is a credit
report within the meaning of FCRA. In addition, we
hold that adverse action notices must communicate to
the consumer that an adverse action based on a
consumer report was taken, describe the action,
specify the effect of the action upon the consumer,
and identify the party or parties taking the action.
With respect to which companies in a group may be
liable under FCRA, we hold that a company that
makes the rate-setting decision, a company that
issues the insurance policy, and any company that
denies insurance at a more favorable rate may be held
jointly and severally liable, and that such companies
may provide a single adverse action notice to
consumers containing all of the requisite information.
Finally, we adopt the Third Circuit's definition of
"willfully": Reckless disregard is sufficient.

As a consequence of these rulings, we hold that the
district court erred in granting summary judgment to
Hartford Fire on the basis that increased charges for

Case: 1:05-cv-00138 Document #: 73 Filed: 02/03/06 Page 60 of 62 PageID #:931

2006 WL 171920                                                                    Page 14
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
(Cite as: 2006 WL 171920 (9th Cir.(Or.)))

insurance in an initial policy do not constitute adverse actions, and in denying Reynold's request for leave to amend his complaint to add Hartford PCIC and Hartford Midwest for that same reason. Likewise, we hold that the district court erred in granting summary judgment to GEICO Indemnity on the basis that the actions it took were not adverse and granting summary judgment to Hartford Fire, Government Employees, and GEICO General on the basis that only the issuer of insurance can be liable under FCRA. Next, we hold that summary judgment may not be granted on the alternative grounds that a transmission that a consumer has insufficient credit information to generate a score is not a credit report, or that Hartford Fire's adverse action notices were sufficient. In sum, we reverse the district court's grant of summary judgment with respect to all defendants in both *Edo* and *Reynolds,* reverse its denial of Reynolds' request to amend his complaint to add Hartford PCIC and Hartford Midwest, and remand to the district court for further proceedings consistent with this opinion. [FN18]

**REVERSED and REMANDED.**

> FN1. Section 1681m(a) provides that any person who "takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" must provide "notice of the adverse action to the consumer." Section 1681a(k)(1)(B)(i) defines an "adverse action" as "a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance."

> FN2. We do not intend this list to be exhaustive.

> FN3. Rausch is no longer pursuing his appeal.

> FN4. Reynolds also named Hartford Financial Services Group, Inc., which serves as a holding company, but is not pursuing his claims against that entity.

> FN5. In connection with Reynolds' request for automobile insurance, he was labeled a "no hit" because his name and address did not match any person's in the national

database. In connection with his homeowners insurance request, he was labeled a "no score" because, while his name and address did call up information in the database, the information was insufficient to generate an insurance score. As both a label of "no hit" and "no score" have the same practical effect, for convenience's sake we will hereafter refer in this opinion to a report in either category as a "no hit."

> FN6. Edo is not pursuing his appeal against GEICO Casualty Corporation ("GEICO Casualty"), a company that writes insurance policies for high risk consumers and charges the highest rates. GEICO Casualty did not issue a policy of insurance to Edo, and Edo did not seek to obtain a policy at the unfavorable rates the company charged.

> FN7. The related cases are resolved by memoranda of disposition filed concurrently herewith.

> FN8. An adverse action under FCRA can, of course, only occur if the increase in charge was due to "information contained in a consumer report." 15 U.S.C. § 1681m(a). The consumer reports at issue in these cases are credit reports. While increases in charges may occur because of many factors, plaintiffs contest only the increases due to unfavorable credit information.

> FN9. We note that our holding is consistent with the Federal Trade Commission's interpretation of the statute. Because we find FCRA unambiguous, however, we reach our decision independently of, and do not defer to, the agency's interpretation. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

> FN10. Although our discussion has principally related to initial insurance policies, our interpretation of "increase in any charge" is obviously not limited to a consumer's first policy. As we have explained, an increased charge is a charge that is higher than it would otherwise have been but for the existence of some factor that causes the insurer to charge a higher price. This definition applies equally to initial issues, amendments, and renewals of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insurance policies.

FN11. We note that the statute does not require an insurance company to issue an adverse action notice simply because a consumer does not get the best possible rate. If a better credit report would not have reduced the consumer's insurance rate, his credit report is not the cause of the higher price and therefore no adverse action based on a credit report has occurred.

FN12. Making a slightly different argument, at least rhetorically, the GEICO Companies also argue that the action they took against Edo was not adverse because he was placed in the same company that he would have been placed in had his credit information not been used. While this is a true statement, it is only so because if the consumer refuses to allow his credit information to be used, the sales counselor assigns the consumer the "neutral" credit weight. Therefore, the GEICO Companies' argument that the action was not adverse because it was the same as if no credit information had been used is functionally identical to its argument that the action was not adverse because it was not detrimental when compared to the result using a "neutral" credit rating. Thus, this argument fails as well.

FN13. The notice must also contain information regarding the consumer reporting agency. It it must provide the name, address, and telephone number of the agency that provided the report, a statement that the agency did not make the adverse decision and is not able to explain it to the consumer, a statement setting forth the consumer's right to obtain a free disclosure of the consumer's file from the agency, and a statement setting forth the consumer's right to dispute directly with the agency the accuracy or completeness of any information in the report. See 15 U.S.C. § 1681m(a)(2)-(3); 16 C.F.R. § 698, App. H.

FN14. We do not decide whether a fuller description of what specific information was adverse is required as this question is not before us.

FN15. While the parties do not agree on every issue of fact, we hold that on the record before us there is no issue of material fact as to whether (1) Government Employees and Hartford Fire made the decisions that increased Edo's and Reynolds' rates, respectively, (2) GEICO General denied Edo a policy, and (3) GEICO Indemnity issued Edo a policy at an increased rate. All of these actions were taken by the companies involved and all constituted "adverse actions" within the meaning of FCRA.

FN16. "Any person who *willfully* fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer" for actual or statutory damages, punitive damages, and reasonable attorney's fees. 15 U.S.C. § 1681n (emphasis added).

FN17. The Eighth Circuit has rejected the reckless disregard standard and requires actual knowledge with regard to the law. *Phillips,* 312 F.3d at 370 ("[W]ilful noncompliance under section 1681n requires knowing and intentional commission of an act the defendant knows to violate the law."). The Sixth Circuit has implied that actual knowledge is necessary. *Duncan,* 149 F.3d at 429 (suggesting that an actual belief of legality suffices to defeat willfulness liability under FCRA). The Eighth and Sixth Circuits, however, ignore *Thurston* and the cases that follow its reasoning.

FN18. We note that on appeal, plaintiffs seek only a reversal of the grant of summary judgment to defendants, and do not request such a judgment on their own behalf. Although "a court has the power sua sponte to grant summary judgment to a non-movant when there has been a motion but no cross-motion," we decline to do so here. *Kassbaum v. Steppenwolf Prod., Inc.,* 236 F.3d 487, 494 (9th Cir .2000).

--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 2731226 (Appellate Brief) Appellant's Reply Brief Filed under Seal Pursuant to Protective Order in Oregon District Court (Oct. 18, 2004)Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 171920
--- F.3d ----, 2006 WL 171920 (9th Cir.(Or.)), 06 Cal. Daily Op. Serv. 689
**(Cite as: 2006 WL 171920 (9th Cir.(Or.)))**

Page 16

• 2004 WL 1125578 (Appellate Brief) Appellees' Brief (Apr. 02, 2004)Original Image of this Document (PDF)

• 04-35279 (Docket) (Apr. 02, 2004)

• 2004 WL 443258 (Appellate Brief) Brief of the Federal Trade Commission as Amicus Curiae Supporting Appellants and Urging Reversal (Jan. 23, 2004)Original Image of this Document (PDF)

• 03-35695 (Docket) (Aug. 26, 2003)

• 2003 WL 23531940 (Appellate Brief) Appellant's Reply Brief (May. 04, 2003)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.